IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § § | |
| Plaintiffs, | § § | No. 1:18-cv-637-RP |
| v. | § § | |
| U.S. DEPARTMENT OF STATE, ANTHONY BLINKEN, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS; MIKE MILLER, in his official capacity as Deputy Assistant Secretary of Defense Trade Controls; SARAH HEIDEMA, in her official capacity as Director of Policy, Office of Defense Trade Controls Policy, | § § § § § § § § § | |
| Defendants. | § | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................................2

    A.    Statutory and Regulatory Background ..........................................................................2

    B.    Interagency Effort to Review and Revise Export Regulations ....................................4

    C.    Defense Distributed I Litigation ...................................................................................5

    D.    *Defense Distributed I* Settlement Agreement and State's Fulfillment of the
        Settlement Agreement...................................................................................................6

    E.    The Western District of Washington enjoins the State Department............................7

    F.    The State Department and Commerce issue final rules..................................................9

    G.    States sue to challenge the final rules............................................................................9

    H.    Current Litigation with Defense Distributed ..............................................................10

LEGAL STANDARD ...............................................................................................................11

ARGUMENT .............................................................................................................................12

I.      The Court Lacks Jurisdiction.......................................................................................12

II.     Plaintiffs Are Unlikely To Succeed On Their Contract Claims ....................................14

    A.    This Court does not have jurisdiction over contract claims. .......................................14

    B.    The Government has fulfilled its obligations in the Settlement Agreement. ..............16

III.    Plaintiffs' Constitutional Claims Are Barred. ..............................................................20

    A.    Plaintiffs' constitutional claims are barred by claim preclusion....................................20

    B.    Plaintiffs' constitutional claims have been released. ....................................................23

IV.    Plaintiffs Are Not Likely To Succeed On The Merits Of Their Constitutional Claims..........25

    A.    Plaintiffs forfeited their arguments on the merits of their constitutional
        claims by failing to develop them................................................................................25

    B.    Export controls on functional files that operate to create a firearm or its
        component parts do not violate the First Amendment. ................................................26

    C.    The ITAR is a content-neutral regulation of technical data that directly
        facilitate the manufacture of defense articles or their component parts. ....................28

    D.    This regulation also satisfies strict scrutiny.................................................................32

    E.    ITAR's export controls are not an unconstitutional prior restraint. ............................34

    F.    The ITAR's export controls are not unconstitutionally overbroad. ............................36

V.     Plaintiffs Cannot Satisfy the Balance Of Harms Or Public Interest Prongs...........................37

CONCLUSION.............................................................................................................................39

# TABLE OF AUTHORITIES

## Cases

*Alabama Rural Fire Ins. Co. v. Naylor,*
    530 F.2d 1221 (5th Cir. 1976) ............................................................................................20

*Ayissi v. Kroger Tex., L.P.,*
    No. 20-20652, 2021 U.S. App. LEXIS 11261 (5th Cir. Apr. 19, 2021) ..................... 20, 21

*Beardslee v. Brown,*
    393 F.3d 899 (9th Cir. 2004) ............................................................................................ 12, 13

*Bell BCI Co. v. United States,*
    570 F.3d 1337 (Fed. Cir. 2009) ........................................................................................23

*Borup v. Western Operating Corp.,*
    130 F.2d 381 (2d Cir. 1942) ..............................................................................................18

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ..........................................................................................................36

*Brockett v. Spokane Arcades, Inc.,*
    472 U.S. 491 (1985) ..........................................................................................................36

*Bryant v. Ford Motor Co.,*
    886 F.2d 1526 (9th Cir. 1989) ..........................................................................................12

*Burson v. Freeman,*
    504 U.S. 191 (1994) ..........................................................................................................31

*Centex Corp. v. Dalton,*
    840 S.W.2d 952 (Tex. 1992) ..............................................................................................19

*CIC Prop. Owners v. Marsh USA, Inc.,*
    460 F.3d 670 (5th Cir. 2006) ............................................................................................23

*City of Austin v. Kinder Morgan Texas Pipeline, LLC,*
    447 F. Supp. 3d 558 (W.D. Tex. 2020) ..............................................................................11

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ..................................................................................................... 34, 35

*City of Littleton v. Z.J. Gifts D-4 LLC,*
    541 U.S. 774 (2004) ..........................................................................................................35

*City of Renton v. Playtime Theatres, Inc.,*
    475 U.S. 41 (1986) ............................................................................................................28

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984) ..................................................................................................28

*Clayton v. ConocoPhillips Co.,*
    722 F.3d 279 (5th Cir. 2013) .............................................................................. 23, 24

*Ctr. for Inquiry, Inc. v. Warren,*
    No. 19-11029, 2021 U.S. App. LEXIS 3875 (5th Cir. Feb. 10, 2021) ......................... 13, 14

*Davis v. Dallas Area Rapid Transit,*
    383 F.3d 309 (5th Cir. 2004) ....................................................................................21

*Def. Distributed v. U.S. Dep't of State,*
    121 F. Supp. 3d 680 (W.D. Tex. 2015) ..............................................................*passim*

*Def. Distributed v. U.S. Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) .........................................................................*passim*

*Def. Distributed v. U.S. Dep't of State,*
    865 F.3d 221 (5th Cir. 2017) ......................................................................................6

*Def. Distributed v. U.S. Dep't of State,*
    138 S. Ct. 638 (2018) .................................................................................................6

*Def. Distributed v. United States Dep't of State,*
    947 F.3d 870 (5th Cir. 2020) ......................................................................................8

*Dubuc v. Green Oak Township,*
    312 F.3d 736 (6th Cir. 2002) ....................................................................................22

*Ellis v. Amex Life Ins. Co.,*
    211 F.3d 935 (5th Cir. 2000) ....................................................................................22

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ..................................................................................................35

*Freedman v. Maryland,*
    380 U.S. 51 (1965) ....................................................................................................35

*Haig v. Agee,*
    453 U.S. 280 (1981) ..................................................................................................37

*Heritage Bank v. Redcom Labs., Inc.,*
    250 F.3d 319 (5th Cir. 2001) ....................................................................................19

*Holder v. Humanitarian L. Project ("HLP"),*
    561 U.S. 1 (2010) ................................................................................................32, 33

*Holland v. United States,*
   621 F.3d 1366 (Fed. Cir. 2010) ................................................................................... 23

*Hunt Constr. Grp. v. United States,*
   281 F.3d 1369 (Fed. Cir. 2002) ................................................................................... 16

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
   515 U.S. 557 (1995) ...................................................................................................... 26

*Instituto Mexicano Del Seguro Soc. v. Orthofix Int'l N.V.,*
   No. 418-cv-00121-ALM-KPJ, 2018 WL 4561621 (E.D. Tex. Sept. 24, 2018) ............... 22

*Lane v. Pena,*
   518 U.S. 187 (1996) ...................................................................................................... 20

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................................................................. 12, 13

*McCullen v. Coakley,*
   573 U.S. 464 (2014) ................................................................................................. 28, 31

*Misischia v. St. John's Mercy Health Sys.,*
   457 F.3d 800 (8th Cir. 2006) ....................................................................................... 22

*N.Y. State Club Ass'n v. City of New York,*
   487 U.S. 1 (1988) .......................................................................................................... 36

*N.Y. Times Co. v. United States,*
   403 U.S. 713 (1971) ...................................................................................................... 35

*Nation Magazine v. Dep't of,*
   *Def.*, 762 F. Supp. 1558 (S.D.N.Y. 1991) .................................................................... 27

*Near v. Minnesota ex rel. Olson,*
   283 U.S. 697 (1931) ...................................................................................................... 35

*Nken v. Holder,*
   556 U.S. 418 (2009) ...................................................................................................... 37

*Oreck Direct, LLC v. Dyson, Inc.,*
   560 F.3d 398 (5th Cir. 2009) ....................................................................................... 24

*Police Dep't of City of Chi. v. Mosley,*
   408 U.S. 92 (1972) ........................................................................................................ 30

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ..................................................................................... 28, 29, 30, 31

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006) ........................................................................................................31

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
    632 F.3d 938 (5th Cir. 2011) ......................................................................................37

*Stagg P.C. v. U.S. Dep't of State*,
    158 F. Supp. 3d 203 (S.D.N.Y. 2016),
    *aff'd*, 673 F. App'x (2d Cir. 2016)..............................................................................31

*State v. Def. Distributed*,
    No. 20-35030, 2020 WL 4332902 (9th Cir. July 21, 2020) ............................... 8, 9

*Telecare Corp. v. Leavitt*,
    409 F.3d 1345 (Fed. Cir. 2005) ..................................................................................15

*Texas v. Johnson*,
    491 U.S. 397 (1989) ......................................................................................................26

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ......................................................................................................28

*U. S. Marine, Inc. v. United States*,
    478 F. App'x 106 (5th Cir. 2012) ................................................................14, 15, 16

*United States. v. Chi Mak*,
    683 F.3d 1126 (9th Cir. 2012) ............................................................................*passim*

*United States v. Edler Indus.*,
    579 F.2d 516 (9th Cir. 1978) .................................................................................30, 35

*United States v. Hicks*,
    980 F.2d 963 (5th Cir. 1992) ......................................................................................36

*United States v. Jones*,
    131 U.S. 1 (1889) ..........................................................................................................20

*United States v. O'Brien*,
    391 U.S. 367 (1968) ................................................................................................26, 28

*United States v. Pink*,
    315 U.S. 203 (1942) ......................................................................................................37

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ...................................................................................27, 29

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ...................................................................................26, 27

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ................................................................................................28

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................................36

*Washington v. U.S. Dep't of State*,
  318 F. Supp. 3d 1247 (W.D. Wash. 2018) ..............................................................8

*Washington v. U.S. Dep't of State*,
  420 F. Supp. 3d 1130 (W.D. Wash. 2019) ..............................................................8

*Washington v. U.S. Dep't of State*,
  443 F. Supp. 3d 1245 (W.D. Wash. 2020) ..........................................................9, 12

*Washington v. U.S. Dep't of State*,
  No. 20-35391, 2021 WL 1621320 (9th Cir. Apr. 27, 2021)..........................10, 12, 38

*Weaver v. Metro. Life Ins. Co.*,
  939 F.3d 618 (5th Cir. 2019) ..................................................................................16

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) ....................................................................................................11

*Wise v. Wilkie*,
  955 F.3d 430 (5th Cir. 2020) ..................................................................................25

**Statutes**

5 U.S.C. § 704 ................................................................................................................15

5 U.S.C. § 706(2)(A) ......................................................................................................16

5 U.S.C. § 706(2)(B) ......................................................................................................16

5 U.S.C. § 706(2)(C) ......................................................................................................16

5 U.S.C. § 706(2)(D) ......................................................................................................16

18 U.S.C. § 2339B(a)(1) ................................................................................................32

22 U.S.C. § 2751 *et seq.*...............................................................................................3

22 U.S.C. § 2751 ..............................................................................................................4

22 U.S.C. § 2778(a)(1) ..............................................................................................28, 33

22 U.S.C. § 2778(b)(2) ....................................................................................................3

22 U.S.C. § 2778(f)(1) ....................................................................................................4

28 U.S.C. § 1491 .................................................................................................................14

**Rules**

Fed. R. App. P. 41(b) ...................................................................................................... 10, 12

**Regulations**

3 C.F.R. § 223 ......................................................................................................................3

22 C.F.R. parts 120-130 ........................................................................................................3

22 C.F.R. § 120.10(b) .................................................................................................... 33, 36

22 C.F.R. § 120.11(a) ..........................................................................................................34

22 C.F.R. § 121.1 ...................................................................................................... 3, 5, 30

22 C.F.R. § 120.6 ................................................................................................................33

28 C.F.R. § 0.20 ..................................................................................................................19

83 Fed. Reg. 24,198 (May 24, 2018) ("State NPRM") ................................................7, 12, 16

83 Fed. Reg. 24,166 (May 24, 2018) ("Commerce NPRM") .................................................7

85 Fed. Reg. 3,819 (Jan. 23, 2020) ("State Rule") ...............................................9, 12, 16

85 Fed. Reg. 4136 (Jan. 23, 2020) ("Commerce Rule") .........................................................9

# INTRODUCTION

For several decades, the State Department has uniformly regulated the export of defense articles and services, including technical data, in both physical and digital form, in order to protect and promote national security and foreign policy. As the world changes and technology advances, digital exports have the potential to enable the exponential manufacture of dangerous weapons abroad. Such exports can be more harmful to U.S. national security and foreign policy interests than the single export of a physical defense article. Regulating the export of technical data files that function to allow for the production of defense articles is essential to controlling the dissemination of defense articles. This case concerns the ability of a private organization to disregard government export controls, which a federal district court ordered must remain in place, and to indiscriminately export functional files that can produce and proliferate controlled weapons.

Since 2013, Plaintiff Defense Distributed has sought to export, on an unlimited basis, certain 3-D gun files that enable anyone with a 3-D printer to produce an operable firearm or its component parts. Plaintiffs previously challenged the constitutionality of the Government's licensing requirements applicable to functional 3-D-gun files and moved to enjoin the State Department from applying its regulations to these files. This Court denied the requested injunction because Plaintiffs did not meet their burden in demonstrating that the balance of equities and the public interest favored an injunction, and because this Court concluded they were unlikely to succeed on the merits. On the merits, this Court concluded that the State Department's regulation of functional 3-D gun files did not violate the First Amendment. The Fifth Circuit affirmed the denial of the preliminary injunction.

The subsequent procedural history is undoubtedly complicated and includes: a Settlement Agreement between Defense Distributed and the State Department; an injunction against the State Department from taking further actions to carry out the Settlement Agreement; rulemaking by the State Department and Commerce Department regarding the continued regulation of 3-D-gun files; and a second injunction against the State Department's rulemaking and a subsequent appeal in which the Ninth Circuit ruled that the court had no jurisdiction to review (or enjoin) the State Department's rulemaking.

But one fact is clear: by operation of a court-ordered injunction that remains in place today, the State Department was ordered to maintain controls over 3-D-gun files to the same extent it did in 2015, when this Court denied Plaintiffs' motion for a preliminary injunction against those regulations. Notwithstanding the still-operative injunction under which 3-D-gun files remain subject to State Department regulations, on April 28, 2021, Defense Distributed posted 16,000 3-D-gun-related files on the internet without seeking a license or prior authorization for their export.

Plaintiffs ask this Court to exercise its equitable jurisdiction in an extraordinary manner. Plaintiffs ignored the effect of a court-ordered injunction and now seek to co-opt the jurisdiction of this Court to release Plaintiffs from the State Department's regulatory authority. But this request for preliminary injunctive relief fails.

First, Plaintiffs have no standing. The injury they allege is not is not caused by the Defendants nor redressable by an order of this court. Second, the balance of equities and public interest lean heavily in favor of denying an injunction. Finally, the Defendants are unlikely to succeed on the merits of their contract or constitutional claims. This Court does not have jurisdiction over Plaintiffs claim that Defendants breached the Settlement Agreement; that claim must be brought in the Court of Federal Claims, and, in any event, Defendants fulfilled their obligations under the Agreement. Both a broad release in the Settlement Agreement, as well as the doctrine of claim preclusion, prevent Plaintiffs from advancing their constitutional claims in this litigation. Regardless, Plaintiffs cannot meet their burden to show that they are likely to succeed on the merits of their constitutional claims. Plaintiffs forfeited these claims by failing to develop them in their briefing. More fundamentally, Plaintiffs cannot succeed on their claims because the State Department's regulation of functional files that direct the manufacture of defense article does not violate the First Amendment. For all these reasons, set forth further below, Plaintiffs' motion for a preliminary injunction should be denied.

## BACKGROUND

A.   <u>Statutory and Regulatory Background</u>

The statutory basis for the regulatory regime challenged in this case comes from the Arms

Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.* The Act authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States," to "control the import and the export of defense articles and defense services." *Id.* § 2778(a)(1). "[T]he President is authorized . . . to promulgate regulations for the import and export of such articles and services," and "to designate items as defense articles and defense services," by describing them on the "United States Munitions List." *Id.* With certain exceptions not relevant here, "no defense articles or defense services . . . may be exported or imported without a license for such export or import." 22 U.S.C. § 2778(b)(2).

Under authority delegated by the President, the State Department administers the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. parts 120–130, which control the export of defense articles and services described on the United States Munitions List ("USML"). *See* Administration of Reformed Export Controls, Exec. Order No. 13,637, § 1(n), 3 C.F.R. §§ 223, 224 (2014) (delegation of authority). As relevant here, the USML includes both physical defense articles and "[t]echnical data . . . directly related" to certain articles. 22 C.F.R. § 121.1(a)(1); *see also id.* § 120.6. "Technical data" includes, among other things, "[i]nformation . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles," such as "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *Id.* § 120.10(a)(1). Consequently, absent an applicable exemption, the ITAR controls the export of files that can be used to 3-D print defense articles, including any firearms or components described on the USML.

In many cases, controls over technical data are even more important than controls over a physical item because control of technical data prevents exponential proliferation. Ex. A, Declaration of Michael F. Miller ¶ 13 ("Miller Decl."). Absent the ITAR's controls over technical data, controls on only physical articles would have a greatly diminished practical effect. Export controls over technical data are thus not only authorized by the AECA, but advance its purposes and the interests of the United States by preventing foreign adversaries, terrorist groups, or others from accessing the means to design, develop, produce, or even counteract items that provide a military or intelligence

advantage. *Id.* In that same vein, controlling technical data exports is also a core part of United States foreign policy, as it discourages arms races, while helping to maintain regional power balances and mutually beneficial defense relationships. *See* 22 U.S.C. § 2751; Miller Decl., ¶ 13.

The definition of technical data, however, still expressly includes significant safeguards that recognize the importance of balancing free-speech interests while also ensuring that the ITAR advances U.S. national security and foreign policy interests. Miller Decl., ¶ 14. Technical data "does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities," nor does it include "information in the public domain." *Id.* § 120.10(b). Information in the "public domain," is defined as information "which is published and which is generally accessible or available to the public" in a number of forms and locations. *Id.* § 120.11(a).[1] The ITAR also regulates only technical data that is *exported* abroad or to foreign persons in the United States. *Id.* § 120.17.

A party can request a formal determination from the State Department about whether an article or service is on the USML and subject to the ITAR. Miller Decl., ¶¶ 25–32. Under the "commodity jurisdiction procedure," on request, "the Directorate of Defense Trade Controls shall provide a determination of whether a particular article or service is covered by the U.S. Munitions List." *Id.* § 120.4(a). Commodity jurisdiction decisions may be appealed to the Deputy Assistant Secretary of State for Defense Trade Controls, and if desired, to the Assistant Secretary for Political-Military Affairs. *Id.* § 120.4(g).

B.   Interagency Effort to Review and Revise Export Regulations

Under the AECA, the President is directed to "periodically review the items on the [USML] to determine what items, if any, no longer warrant export controls." 22 U.S.C. § 2778(f)(1). Since 2010, at the direction of then-President Obama, the State Department has engaged in an interagency

---

[1] This includes: "(1) sales at newsstands and bookstores"; (2) "subscriptions . . . available" to the public; (3) "second class mail[]"; (4) "libraries"; (5) "patents"; (6) "unlimited distribution at a conference, meeting, seminar, trade show, or exhibition, generally accessible to the public"; (7) "public release (i.e., unlimited distribution" through any other manner after "approval by [a] U.S. government department or agency"); and (8) "[u]niversity research." *Id.* § 120.11(a).

effort to review and revise the entire USML to limit its scope to those defense articles that provide the United States with a critical military or intelligence advantage. *See* Miller Dec. ¶¶ 33–39. *Press Release*, The White House (Aug. 30, 2010), https://go.usa.gov/xdNe4 (last visited May 11, 2021). As part of this effort, the State Department published 26 rules between 2013 and 2017, revising 18 of the 21 USML categories by removing some items from the USML; for those items, the Department of Commerce has assumed regulatory authority.[2] *See* Miller Decl., ¶ 36. Thus, as of 2017, only three USML categories—Categories I–III—had not yet been revised. Among the items then-controlled under Category I were non-automatic and semi-automatic firearms up to .50 caliber. 22 C.F.R. § 121.1, Category I(a), (i) (2019). By early 2015, however, the State Department had begun drafting regulations to remove these items from the USML. *See* Miller Dec. ¶ 50.

C.   Defense Distributed I Litigation

In 2012, Defense Distributed posted on the internet computer files that enabled individuals with 3-D printers to produce operable plastic firearms. *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015) ("*Defense Distributed I*"). In May 2013, the State Department advised Defense Distributed that it may have released technical data controlled by the ITAR without the required authorization. *Id.* at 687. Defense Distributed removed the technical data and submitted a commodity jurisdiction request for the various files. *Id.* Ultimately, the State Department determined that some files were subject to the ITAR, while others were not. *Id.* at 687–88.

Defense Distributed, together with the Second Amendment Foundation, sued the State Department, contending that its export regulations, including the requirement for a license to publish certain categories of files both presently and in the future, violated the First, Second, and Fifth Amendments. *Id.* at 456. Defense Distributed moved for a preliminary injunction that would allow it to post the regulated files on the internet without a license until the case was resolved, and to publish similar files in the future. *Defense Distributed I*, 1:15-cv-372, Dkt. 7-1. This Court denied the requested injunction. 121 F. Supp. 3d at 687. This Court held that Plaintiffs had not met their burden as to the

---

[2] The Department of Commerce regulates exports through a similar regulatory scheme—the Export Control Regulations (EAR) sets the rules for export of items on the Commerce Control List (CCL).

third and fourth preliminary injunction factors—the balance of equities and the public interest—which merged because the government's stated interest is "protecting the public by limiting access of foreign nationals to 'defense articles.'" *Id.* at 689. As this Court explained, Plaintiffs "fail[ed] to consider the public's keen interest in restricting the export of defense articles," and "the interest—and authority—of the President and Congress in matters of foreign policy and export." *Id.* The Court also addressed the merits of Plaintiffs' claims, and concluded that the regulations were both a lawful exercise of authority and that Plaintiffs did not show a substantial likelihood that the regulations violated Plaintiffs' constitutional rights. *Id.* at 691–96.

The Fifth Circuit affirmed, concluding that the "potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs–Appellants' strong First Amendment interest," and that this Court therefore did not abuse its discretion in denying the preliminary injunction. *Def. Distributed v. U.S. Dep't of State,* 838 F.3d 451, 460 n.12 (5th Cir. 2016). Plaintiffs, the Fifth Circuit noted, failed both before this Court and the Fifth Circuit "to give any weight to the public interest in national defense and national security." *Id.* at 458. That "stated interest in preventing foreign nationals including all manner of enemies of this country from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest." *Id.* The Fifth Circuit denied rehearing *en banc*, over a four-judge dissent, 865 F.3d 211, 212 (5th Cir. 2017), and the Supreme Court declined to review the denial of the preliminary injunction, 138 S. Ct. 638 (2018).

D.    *Defense Distributed I* Settlement Agreement and State's Fulfillment of the Settlement Agreement.

This Court subsequently ordered the parties to exchange written settlement demands, *Defense Distributed I,* 1:15-cv-372, Dkt. 88, initiating a process that ended with the parties reaching a settlement agreement. The parties executed the Settlement Agreement on June 29, 2018. *Defense Distributed* II, 1:18-cv-637, Second Amended Complaint ("SAC"), Dkt. 117, Ex. A. Pursuant to the settlement, the State Department agreed to take temporary actions concerning State's regulation of technical data in the form of certain 3-D firearms files, to the extent authorized by law, including the Administrative

6

Procedure Act.  Plaintiffs agreed to stipulate to dismissal of their claims with prejudice and executed a broad release of claims that discharged State "from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action." Settlement Agreement ¶ 3.

Consistent with the directive to limit the ITAR export controls to items that provide the United States with a critical military or intelligence advantage, the State Department issued a notice of proposed rulemaking ("NPRM") that would remove many firearm-related items from the USML. Simultaneously, the Commerce Department issued an NPRM that would add many of those same items to the Commerce Control List ("CCL").  *See* 83 Fed. Reg. 24,198 (May 24, 2018) ("State NPRM"); 83 Fed. Reg. 24,166 (May 24, 2018) ("Commerce NPRM").  Those rules, had they been adopted as proposed, would have allowed for the public release of certain technical data, including some 3-D-firearms files because, under then-existing Commerce regulations, the EAR defined "technology" and "software" in such a way that would have excluded 3-D-firearms files posted on the internet from those regulatory definitions.  Miller Decl., ¶ 52.

After issuance of the NPRM, and consistent with the Settlement Agreement, on July 27, 2018, State announced it was temporarily modifying the Munitions List to exclude the technical data at issue in the Defense Distributed litigation and sent a letter to Defense Distributed approving the 3-D-gun files for public release.  Defense Distributed acknowledged that these actions complied with the Settlement Agreement.  *See Defense Distributed I*, Pls.' Mot. to Am. at 6, Dkt. 117.  On July 27, 2018, the parties filed a stipulation of dismissal with prejudice pursuant to Rule 41(a)(1)(A)(ii) and 41(a)(1)(B). *Id.* Dkt. 112.  The parties did not submit the Settlement Agreement to the Court; nor did they ask the Court to adopt the Settlement Agreement in an order or to retain jurisdiction over the matter.  On July 30, 2018, this Court entered an order dismissing the case with prejudice.  *Id.*, Dkt. 113.

E.     The Western District of Washington enjoins the State Department.

That same day, July 30, 2018, a coalition of States sued in the Western District of Washington

under the Administrative Procedure Act challenging the State Department's actions related to its settlement with Plaintiffs. *See State of Wash., et al. v. U.S. Dep't of State, et al.*, No. 2:18-cv-1115-RSL (W.D. Wash. 2018) ("*Wash. I*"). The State Department defended its actions as lawful, but that court entered a temporary restraining order against the Government, followed by a preliminary injunction on August 27, 2018. *See Wash. v. U.S. Dep't of State,* 318 F. Supp. 3d 1247, 1264 (W.D. Wash. 2018). The court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018." *Id.* The court also ordered the Government to "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued until further order of the Court." *Id.* This meant that the State Department was enjoined from continuing to implement the Settlement Agreement. *See Defense Distributed I*, Dkt. 136 at 1. Defense Distributed agreed that the *Wash. I* court order rendered the Agreement a "legal nullity." *Id.*, Dkt. 117 at 11.

Based on the injunctive relief ordered by the court in *Wash. I*, State removed the announcement from its website and informed counsel for Plaintiffs that the letter to Mr. Wilson should be considered a nullity during the pendency of the injunction. *See Defense Distributed II*, 1:18-cv-637, Second Amended Complaint ("SAC") Dkt. 117, Ex. D. After the *Wash. I* court enjoined the effects of the State Department's compliance with the Settlement Agreement, the *Defense Distributed I* Plaintiffs moved to set aside the dismissal with prejudice and reopen the case. *Defense Distributed I*, Dkt. 117. This Court denied the request, Dkt. 136, and that decision was affirmed on appeal. *Def. Distributed v. United States Dep't of State*, 947 F.3d 870 (5th Cir. 2020).

On November 12, 2019, the *Wash. I* court granted summary judgment in favor of plaintiffs, finding that the State Department had violated the APA. *Wash. v. U.S. Dep't of State*, 420 F. Supp. 3d 1130, 1135 (W.D. Wash. 2019). As a result, the court vacated the State Department's temporary modification of the USML and its letter to Defense Distributed. *Id.* at 1148. The State Department did not appeal that final decision, and in any event, the issue would soon be mooted when State issued the final rules discussed below. *State v. Def. Distributed*, No. 20-35030, 2020 WL 4332902, at *1 (9th

Cir. July 21, 2020) (dismissing appeal as moot).

F.   <u>The State Department and Commerce issue final rules.</u>

The litigation in the Western District of Washington, together with comments from the public and from members of Congress, called attention to the effect of proposed State and Commerce rules on the regulation of the export of certain 3-D-firearms files.  To address the "national security and foreign policy" concerns with such exports, Commerce's final rule closed the gaps between its own regulations and the prior State export regulation of such 3-D-firearms files under the ITAR.  85 Fed. Reg. 4136 (2020); Miller Decl., ¶ 70–78.  And so, in a pair of final rules published January 23, 2020, the State Department removed certain items and their technical data, and thus the files, from the USML and the Commerce Department effectively added the same items and files to the CCL.  85 Fed. Reg. 3819 (Jan. 23, 2020) ("State Rule"); 85 Fed. Reg. 4136 (Jan. 23, 2020) ("Commerce Rule"). Under Commerce's final rule, a license is required to export certain 3-D-gun files defined in the rule, including by public posting on the internet.

G.   <u>States sue to challenge the final rules.</u>

A coalition of States sued State and Commerce after the publication of the final rules, alleging that the final rules violated the APA.  *Wash. v. U.S. Dep't of State*, 2:20-cv-111 (W.D. Wash 2020) ("*Wash. II*").  The Government argued, among other things, that the court lacked jurisdiction to review the State and Commerce rules.  *Wash. II*, 443 F. Supp. 3d 1245, 1253 (W.D. Wash. 2020).  The court rejected this jurisdictional argument, and issued a preliminary injunction enjoining the State Department rule "insofar as it alters the status quo restriction on technical data and software directly related to the production of firearms or firearm parts using a 3-D-printer or similar equipment."  *Id.* at 1262–63.  The court severed those enjoined provisions from the rest of the challenged rules, reasoning that the other modifications made by the rules "are part of a decade-long reform to the export-control system," and would have been promulgated even without the amendments to the regulation of 3-D printing files.  *Id.* at 1256.  The court did not enjoin the Commerce Rule.

The Government appealed, and on April 27, 2021, the Ninth Circuit held that the district court

lacked jurisdiction to review the State and Commerce rules. *Wash. v. U.S. Dep't of State*, No. 20-35391, 2021 WL 1621320, at *2 (9th Cir. Apr. 27, 2021).  The Ninth Circuit has not yet issued its mandate; accordingly, the *Wash. II* court's injunction remains in place and the State Department continues to adhere to the still-effective order of that district court.  In other words, the case has not yet been vacated or remanded, and will not be, until the mandate issues.  Absent further proceedings, the mandate is expected to issue by June 18, 2021.  Fed. R. App. P. 41(b); 40(a)(1).

Accordingly, under the terms of the *Wash. II* court order, until the mandate issues, the State Department must continue to treat certain technical data, like certain 3-D gun files, as still described on the USML.  Notwithstanding the *Washington II* court's preliminary injunction and the application of EAR controls to certain 3-D-gun files under the 2020 Commerce rule, on April 28, 2021, Defense Distributed published 16,000 files "with digital firearms information," including "original and legacy firearms models, CAD data, blueprints, and drawings."  *Defense Distributed II*, Pls.' Mot. for Prelim. Inj, at 11 ("Pls.' Mot."), Dkt. 152.  Defendants, through counsel, advised Plaintiffs that the Ninth Circuit's mandate had not yet issued and that the files remained enjoined as subject to the ITAR. *See also* Directorate of Defense Trade Controls, Learn About Export Regulations, *available at* https://www.pmddtc.state.gov/ddtc_public (last visited May 12, 2021) (State Department announcement).  Plaintiffs represent that they have since removed those files from their public-facing website.

H.    Current Litigation with Defense Distributed

On July 29, 2018, Defense Distributed filed the instant suit against Gurbir Grewal, the Attorney General of New Jersey. *Defense Distributed II*, 1:18-cv-637 (W.D. Tex. 2018).  Plaintiffs' claims against the New Jersey AG "revolved around the NJAG's 2018 cease-and-desist letter warning Defense Distributed that its dissemination of printable gun files to New Jersey residents constituted a violation of New Jersey law."  Dkt. 145 at 1–2.  After litigation in the district court and the Fifth Circuit about the court's jurisdiction over the New Jersey Attorney General, on November 11, 2020, Plaintiffs filed a second amended complaint, adding as Defendants the State Department, the Secretary

of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary of Defense Trade Controls, and the Director for the Office of Defense Trade Controls Policy.  *See* SAC, Dkt. 117.  This court severed the claims against the New Jersey AG and transferred them to the District of New Jersey, while retaining the claims against the State Department.  Dkt. 145.

Nearly six months after filing an amended complaint, and fourteen months after the *Wash. II* court's preliminary injunction ordered that 3-D-gun files remain on the USML, Plaintiffs moved for emergency injunctive relief, after they posted approximately 16,000 3-D-gun files on the internet for free download by the public, Dkt. 149, which this Court denied, Dkt. 151.  Plaintiffs then moved for a preliminary injunction on May 5, 2021, seeking an injunction against the State Department to: "(1) cease and desist from enforcing the International Traffic in Arms Regulations … against Defense Distributed and the Second Amendment Foundation, Inc., and (2) cease and desist from otherwise censoring Defense Distributed and the Second Amendment Foundation, Inc. by way of civil or criminal enforcement efforts and threats of the same."  Dkt. 152-2.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008), and "the decision to grant such relief is to be treated as the exception rather than the rule."  *City of Austin v. Kinder Morgan Texas Pipeline, LLC*, 447 F. Supp. 3d 558, 567 (W.D. Tex. 2020).  A plaintiff seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that their substantial injury outweighed the threatened harm to the party whom they sought to enjoin, and (4) that granting the preliminary injunction would not disserve the public interest.  *Id.*  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24. Due to its "extraordinary" nature, no preliminary injunction should be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements.  *Id.*

## ARGUMENT

### I.     The Court Lacks Jurisdiction.

This Court does not have jurisdiction to enjoin the ITAR's regulation of 3-D-gun files because Plaintiffs lack standing.  The cause of Plaintiffs alleged harms is the *Wash. II* injunction—any alleged harm is not fairly traceable to actions by the State Department.  Plaintiffs also cannot show redressability because even if 3-D-gun files are not regulated under the ITAR, these files would be subject to regulation under the EAR.

Plaintiffs fail to establish the requisite "causal connection between" their alleged injuries and the actions they challenge—*i.e.*, they cannot show that any alleged injury is "fairly . . . trace[able]" to Defendants' actions.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The State Department *already provided* the requested relief when it issued regulations that removed "3D-printed guns and their associated electronic files" from the ITAR. Pls.' Mot. at 27; *see* State NPRM at 24,198; and State Rule at 3,823.  As Plaintiffs note, the parties *do not dispute* that under the State Rule, 3-D-gun files are not technical data subject to the ITAR.

The only reason that the relevant 3-D-gun files are still subject to the ITAR—the cause of plaintiffs' alleged harms—is because the District Court in *Wash. II* enjoined part of the State Rule three days before it was set to go into effect.  *Wash. II*, 443 F. Supp. 3d at 1262–63.  But absent further proceedings, the *Wash. II* injunction will soon be vacated because the Ninth Circuit held that the district court lacked jurisdiction to enjoin those regulations.  *Washington v. U.S. Dep't of State*, 2021 WL 1621320 at *8–*9.  That decision will become final once the Ninth Circuit issues its mandate. *Beardslee v. Brown*, 393 F.3d 899, 901 (9th Cir. 2004); *see Bryant v. Ford Motor Co.*, 886 F.2d 1526, 1529 (9th Cir. 1989); Fed. R. App. P. 41 Comm. Notes, 1998.  Absent any further proceedings, the mandate is expected by June 18, 2021.  Fed. R. App. P. 41(b); 40(a)(1).

Plaintiffs ask this Court to order that the ITAR controls lifted *sooner*.  But this Court does not sit to dictate to the Ninth Circuit when its mandate should issue.  The ITAR controls have to remain in place until the Ninth Circuit relinquishes its jurisdiction by issuing its mandate.

Plaintiffs argue that the Ninth Circuit vacated the *Wash. II* injunction instantaneously when it

issued an opinion—but this is incorrect.  The Ninth Circuit's opinion is not self-executing and is not final until the Court issues its mandate.  The Ninth Circuit law on this point is clear:  "Until the mandate issues, a circuit court retains jurisdiction of the case and may modify or rescind its opinion." *Beardslee*, 393 F.3d at 901.  Thus, the *Washington II* injunction remains in place for now—and the State Department has been ordered not to remove 3-D-gun files from the USML—until the mandate issues. Plaintiffs cite no case law to the contrary.  Once the mandate issues and the injunction lifts, the State Final Rule will take effect and the relevant 3-D-gun files will no longer be subject to the ITAR.

Even if this Court had jurisdiction, there is no reason as a prudential matter that it should exercise its extraordinary equitable authority to issue a preliminary opinion about the constitutionality of vestigial regulations that remain temporarily in place only because of another court's injunction— an injunction that is on the threshold of being vacated.  Plaintiffs identify no hardship cognizable in this Court from the Ninth Circuit's process for issuing its mandate.  Plaintiffs added the Department of State to this lawsuit when they filed their Second Amended Complaint on November 10, 2020, but then waited almost *six months* before filing this motion for injunctive relief.  Plaintiffs have identified no specific hardship from waiting a few weeks until the injunction is finally and officially revoked.

Plaintiffs also cannot demonstrate redressability.  Even if this Court were to enjoin the State Department from enforcing the ITAR as to 3-D-gun files that were ordered to remain on the USML, the relevant functional 3-D-gun files would remain regulated under the Commerce final rule.[3] Plaintiffs have not pled a claim against Commerce or shown that they sought any administrative action from Commerce concerning their files in the year since the final rule was issued.  *See Lujan*, 504 U.S. at 568 ("The most obvious problem in the present case is redressability [because] the agencies funding the projects were not parties to the case," so while the District Court could accord relief against the named defendant, any relief "would not remedy respondents' alleged injury.").  The Fifth Circuit's recent case, *Ctr. for Inquiry, Inc. v. Warren*, provides a useful example.  No. 19-11029, 2021 U.S. App.

---

[3] *See* FAQs for the Commerce Categories I–III (final rule), Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML) (85 Fed. Reg. 4136) at 17–23, *available at* https://www.bis.doc.gov/index.php/documents/policy-guidance/2572-faqs-for-the-commerce-category-i-iii-firearms-rule-posted-on-bis-website-7-7-20/file ("DOC FAQ").

LEXIS 3875 (5th Cir. Feb. 10, 2021).  In that case, plaintiffs sued the Dallas County Clerk seeking to compel him "to record marriages conducted by secular celebrants."  *Id.* at *6.  Plaintiffs prevailed in District Court, but the Fifth Circuit reversed for lack of redressability, explaining that "even if [plaintiffs] prevail in this litigation, relief would be incomplete because the appellants would still be subject to criminal prosecution" if they solemnized a marriage ceremony without authorization.  *Id.* Plaintiffs lacked standing because even if they prevailed against the named defendant, the challenged legal barrier "would nevertheless remain."  *Id.* at *7.  Just like the plaintiffs in *Warren*, even if Plaintiffs prevail in this litigation against the State Department, certain functional 3-D gun files would remain regulated under the EAR.

## II.   Plaintiffs Are Unlikely To Succeed On Their Contract Claims

Plaintiffs are unlikely to succeed on the merits of their contract claims (that the Government violated the terms of the Settlement Agreement) for two independent reasons: first, this Court has no jurisdiction to hear Plaintiffs' claim for breach of contract against the Government or the related APA and Due Process claims that sound in contract; and second, even if this Court had jurisdiction, Plaintiffs are unlikely to succeed on the merits because the Government has fulfilled its obligations.

### A.   This Court does not have jurisdiction over contract claims.

Plaintiffs have brought their breach of Settlement Agreement claims in the wrong forum. Defendants are federal agencies and officials sued in their official capacities, so they may be sued only to the extent that Congress has waived sovereign immunity.  *U. S. Marine, Inc. v. U. S.*, 478 F. App'x 106, 109 (5th Cir. 2012).  Congress has waived sovereign immunity for some contract claims, but it requires most claims (including this one) to be brought in the United States Court of Federal Claims.

While the Tucker Act provides a limited waiver of sovereign immunity for breach of contract claims against the federal government, it requires counterparties to file any claim that exceeds $10,000 in the Court of Federal Claims.  28 U.S.C. § 1491.  "[T]he Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over any claim that exceeds $10,000 and is founded upon an express or implied contract."  *U.S. Marine, Inc.*, 478 F. App'x at 109.  Plaintiffs have sued for breach of contract

and have claimed damages "in an amount no less than five million dollars." SAC ¶ 220. Five million dollars greatly exceeds the $10,000 threshold in the Tucker Act, so Plaintiffs' claims sounding in contract must be dismissed for lack of jurisdiction and re-filed in the Court of Federal Claims.[4]

Nothing in the Settlement Agreement gives this Court jurisdiction over claims that the Government breached. Plaintiffs claim that "[t]he State Department waived any and all grounds of opposition to court enforcement of the Settlement Agreement. Settlement Agreement paragraph 4 entails the State Department's consent to 'any civil, criminal, or administrative action . . . permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement." SAC ¶ 224. The full sentence shows that Plaintiffs stretch the text beyond what it can bear.

> *No Admission of Liability:* . . . None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement.

Settlement Agreement ¶ 4. The sentence reflects the parties' intent to limit the situations in which the terms of the Settlement Agreement may be offered into evidence. *Id.* The State Department did not waive "any and all grounds of opposition to court enforcement." *See* SAC ¶ 224. In fact, the parties *specifically contemplated* that there were preexisting limits on enforcement, and that there may not be *any* proceedings (*i.e.* "if any") permitted by law to enforce this contract. *Id.*

The Court also has no jurisdiction over Plaintiffs' APA and Due Process claims that arise from the Settlement Agreement. First, the government has not waived sovereign immunity over APA claims arising from a contract. Under 5 U.S.C. § 704, "the APA waives sovereign immunity only if there is 'no other adequate remedy'" but "[t]he availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005).

---

[4] While the Court of Federal Claims generally has jurisdiction over breach of contract claims against the United States, the Government will contest any breach of contract claim that Plaintiffs might assert in that court. As described below, the Government has not breached the Settlement Agreement with Plaintiffs. Moreover, Plaintiffs' assertion that they have suffered $5 million in unspecified damages related to files that they want to, and in fact have, given away for free on the Internet is dubious at best.

Second, "[a]ny claims stemming from the alleged breach of such provisions clearly sound in contract" and under the Tucker Act, such claims may only be heard in the Court of Federal Claims. *United States Marine, Inc.*, 478 F. App'x at 110. According to Plaintiffs, Defendants purportedly

> violated the APA because the Settlement Agreement proves the actions to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A). These same actions also constitute APA violations because the Settlement Agreement makes them 'contrary to constitutional right, power, privilege, or immunity,' 5 U.S.C. § 706(2)(B), 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,' 5 U.S.C. § 706(2)(C), and 'without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

Pls.' Mot. at 34–35. Plaintiffs also base their Due Process claim on a purported violation of the Settlement Agreement. Under the Tucker Act and the Fifth Circuit's decision in *United States Marine*, all of these claims based on a purported breach of the Settlement Agreement must be dismissed for lack of jurisdiction and refiled in the Court of Federal Claims. 478 F. App'x at 110.

B.  <u>The Government has fulfilled its obligations in the Settlement Agreement.</u>

Even if this Court had jurisdiction, Plaintiffs are unlikely to succeed on their claims for breach of contract because State has complied with the Settlement Agreement. Plaintiffs' allegations of breach have no basis in the text of the Settlement Agreement. Courts "begin with the plain language when interpreting a contract." *Hunt Constr. Grp. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (internal quotations omitted); *see also Weaver v. Metro. Life Ins. Co.*, 939 F.3d 618, 627 (5th Cir. 2019) (applying Texas law, explaining that courts must be "unswervingly faithful to what the words actually say"). Here, the plain language of the Settlement Agreement is clear and unambiguous.

<u>Settlement Agreement ¶ 1(a).</u> "Defendants' commit[ed] to draft and fully pursue, to the extent authorized by law (including the Administrative Procedures Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising the USML Category I to exclude the technical data that is the subject of [*Defense Distributed* I]." Settlement Agreement ¶ 1(a)." Defendants satisfied this provision when they published the proposed rule in the Federal Register on May 24, 2018, and when they published a final rule on January 23, 2020. *See* State NRPM at 24,198;

State Rule at 3,823.  These two rules revised the USML to exclude certain technical data, including the relevant 3-D gun files.  Having made those two publications, there is nothing further that the State Department must do under ¶ 1(a).

Settlement Agreement ¶ 1(b).  Defendants agreed to "announce[], while the above-referenced final rule [was] in development, [] a temporary modification, consistent with the [ITAR Regulations] of USML Category I to exclude the technical data that is subject to [*Defense Distributed I*]."  Settlement Agreement, ¶ 1(b).  There is no dispute that Defendants "made a temporary modification to USML Category I . . . to 'exclude' the *Defense Distributed I* Files from Category I."  Pls.' Mot. at 19.  After making that modification, the State Department had no further obligations under ¶ 1(b).

Settlement Agreement ¶ 1(c).  Defendants agreed to "issu[e] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the [*Defense Distributed I* files] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export license requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."  Settlement Agreement ¶ 1(c).  There is no dispute that on July 27, 2018, Defendants "issued Defense Distributed a license—a letter issued by the State Department's Acting Deputy Assistant Secretary for the Directorate of Defense Trade Controls—authorizing the Defendants to publish the Published Files, Ghost Gunner Files, and CAD Files for 'unlimited distribution.'"  Pls.' Mot. at 19.  After issuing the letter as promised, the State Department had no further obligations under ¶ 1(c).

Settlement Agreement ¶ 1(d).  Defendants agreed to "acknowledg[e] and agree[] that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss use, reproduce, or otherwise benefit from the technical data that is the subject of [*Defense Distribtued* I]."  Settlement Agreement ¶ 1(d).  There is no dispute that Defendants "acknowledged and agreed that the temporary modification permits any United States person to access, discuss, use, reproduce, or otherwise benefit from the *Defense Distributed I* Files; and that the license issued to the *Defense Distributed I* plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files,

and CAD Files." Pls.' Mot. at 19–20. That acknowledgement satisfied the State Department of its obligations under ¶ 1(d). In any event, this sub-paragraph is irrelevant to the current dispute because the ability of United States persons to access 3-D-printed-gun files is not at issue in this case—this case concerns the control of exports to *non–United States* persons.

In short, Defendants upheld their end of the Settlement Agreement by issuing the promised temporary modifications, granting an authorization, and pursuing the publication of a rule that would remove the technical data from the USML. Plaintiffs enjoyed the benefits of these actions before third parties sued under the APA, and a court enjoined the federal government "from implementing or enforcing the 'Temporary Modifications of [USML],' and the letter . . . issued by the U.S. Department of State on July 27, 2018." *Wash. I*, No. 18-cv-1115, Dkt. 23 at 7 (W.D. Wash., July 31, 2018). Plaintiffs now claim that the State Department's compliance with this and other court orders constitutes a breach of contract.

The Defendants are not responsible for third parties suing the State Department under the APA for complying with the Agreement; indeed such a situation was expressly contemplated by the agreement. Settlement Agreement ¶ 1(a) ("Defendants' commit to draft and fully pursue, to the extent authorized by law (*including the Administrative Procedure Act*)") (emphasis added). As this Court explained: "Plaintiffs do not dispute[] that 'Plaintiffs entered into a settlement agreement, negotiated at arm's length, with the understanding that the agreement required Defendants to undertake actions potentially subject to review under the Administrative Procedure Act, as expressly recognized'" in the terms of the Agreement. *Defense Distributed I*, Dkt. 136 at 4, *affirmed* 947 F.3d 870 (5th Cir. 2020). "On these facts, the Court finds that an injunction on the performance of the terms of the settlement agreement was reasonably foreseeable." *Id.* "The terms of the settlement agreement reflect that Plaintiffs were well aware of the regulatory landscape in which the parties were litigating[.]" *Id.* at 6.

The State Department fulfilled its obligations under the Settlement Agreement—State's compliance with orders of a federal court that temporarily, and then permanently, blocked Plaintiffs from receiving the benefits of those actions cannot be construed as a breach by the State Department. A party does not breach its obligations under a settlement agreement by refusing to violate a court

order.  *See Borup v. Western Operating Corp.*, 130 F.2d 381, 385 (2d Cir. 1942) ("[A] promisor is excused, except in unusual circumstances, if performance becomes unlawful by a change in the law made after the contract was executed.").  The Fifth Circuit has explained that "a court order may excuse a party's performance under a contractual obligation[.]" *Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 328 (5th Cir. 2001); *see also Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) (duty to perform is excused when performance would violate the law).  Compliance with an injunction is not a breach, and even if it were, it is an excused breach.

Plaintiffs also have no standing to bring a breach of contract claim because the *Wash. I* judgment and *Wash. II* injunction break the causal and redressability links between State's compliance and Plaintiffs' purported harms.  Plaintiffs know this—they previously told this court "a breach-of-contract suit would not necessarily supply such relief.  Why?  The federal court in Washington has enjoined the State Department from performing the settlement agreement no matter what." *Defense Distributed I*, Dkt. 117, at 11.  The same reasoning applies now: suing for breach of contract would not provide the remedy they seek because the *Wash. I* judgment is final, and the Department of Commerce regulates the export of 3-D-gun files.

None of Plaintiffs other purported claims of "breaches" are supported by the text of the Settlement Agreement.  First, Plaintiffs fault the State Department's litigation strategy in *Wash. I*.  *See* Pls.' Mot. at 24.  But nothing in the Settlement Agreement spoke to—much less mandated—the State Department to appeal any court decision.  Neither of Plaintiffs' letters demanding the State Department appeal point to *any* language in the Settlement Agreement, *see* SAC, Ex. E and F—and for good reason, no language in the Agreement allows Plaintiffs to micromanage the litigation of the United States.  Nor could the Settlement Agreement have done so.  Pursuant to 28 C.F.R. § 0.20, the Solicitor General has the sole authority to "determin[e] whether, and to what extent, appeals will be taken by the Government to all appellate courts"— counsel for *Defense Distributed* do not.

Second, Plaintiffs are wrong to suggest the State Department must do something more than the July 27, 2018 letter to fully comply with ¶ 1(c).  Plaintiffs admit that the "State Department previously issued the [] July 27, 2018 license[,] [b]ut that license has been vacated" by court order.  Jan.

15, 2020, Ltr. M. Goldstein to E. Soskin at 2, SAC, Ex. E.  The text of the Settlement Agreement requires only the letter that State already provided—nothing in the Agreement required the State Department to violate a court order by recognizing the validity of that letter, and nothing in the Agreement requires a *new* letter just because a court invalidated the original one.  Nor have Plaintiffs explained how issuing a license identical to the one set aside by the final judgment of the court in *Wash. I* would not directly violate a court order.

Plaintiffs also have no cause of action for specific performance.  The government has not waived sovereign immunity for claims for specific performance of contracts.  Waivers of sovereign immunity are strictly construed in the Government's favor, and must unambiguously extend to the type of relief sought.  *Lane v. Pena*, 518 U.S. 187, 192 (1996).  The Fifth Circuit has recognized that the United States has not waived sovereign immunity for contract claims seeking specific performance of a contract.  *Alabama Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221, 1229–30 (5th Cir. 1976).  Indeed, this has been the position of the Supreme Court since at least 1889 when assessing statutory waivers for suits against the federal government for breach of contract.  *See United States v. Jones*, 131 U.S. 1, 18 (1889) (Tucker Act did not authorize specific performance against the federal government).

## III.   Plaintiffs' Constitutional Claims Are Barred.

Plaintiffs' constitutional claims cannot be raised in this case for two reasons.  First, Plaintiffs agreed to dismiss their prior case *with prejudice*, so the doctrine of claim preclusion prevents them from filing a new suit with the same nucleus of operative facts.  Second, Plaintiffs "waive[d], release[d], and forever discharge[d] Defendants . . . from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action." Settlement Agreement ¶ 3.

### A.   Plaintiffs' constitutional claims are barred by claim preclusion.

Defense Distributed cannot raise claims in this lawsuit that they previously raised or could have raised in an action that was dismissed with prejudice.  "Res judicata 'forecloses relitigation of

claims that were or could have been raised in a prior action.'" *Ayissi v. Kroger Tex., L.P.*, No. 20-20652, 2021 U.S. App. LEXIS 11261, at *2 (5th Cir. Apr. 19, 2021) (citing *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 312-13 (5th Cir. 2004)).  "A claim is barred by res judicata when (1) the parties in both the prior and current suits are identical, (2) a court of competent jurisdiction rendered the prior judgment, (3) the prior judgment was final and on the merits, and (4) the plaintiff raises the same cause of action in both suits."  *Id.*  When considering whether "[a] plaintiff raises the same cause of action if both claims arise out of 'the same nucleus of operative facts'" a court "consider[s] factors such as whether 'the facts are related in time, space, origin, or motivation, [and] whether they form a convenient trial unit.'"  *Id* at *2–*3.  In *Defense Distributed I*, the same Plaintiffs—Defense Distributed and the Second Amendment Foundation, Inc.—sued the same Defendants—the State Department, the Secretary of State, the Deputy Assistant Secretary Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy—in the same court—the United States District Court for the Western District of Texas.  *Defense Distributed I*, No. 1:15-cv-372 (W.D. Tex.); *see also* SAC ¶ 80.

The only question is whether Plaintiffs' raise the same claims in this new case, which turns on whether the allegations arise from the same nucleus of operative facts.  The answer is straightforward. Plaintiffs in *Defense Distributed I* challenged the constitutionality of regulating 3-D-gun files under the ITAR and sought prospective relief enjoining the application of the ITAR and its technical data controls to certain 3-D-gun files.  As Plaintiffs explain: "*Defense Distributed I* began after the State Department used the [AECA], and its primary implementing regulations, the [ITAR], to impose an illegal prior restraint on public speech concerning technical firearms data[.]"  Pls.' Mot. at 14.  Plaintiffs challenged State Department's regulation of "computer files that Defense Distributed published online . . . includ[ing] CAD files, CAM files, and non-CAD and non-CAM files."  *Id.* at 12.  Their challenge was not limited to the specific files identified in that lawsuit, but rather challenged *the entire ITAR regulatory regime* as applied to 3-D-gun files.  *Defense Distributed I*, No. 15-cv-372, Dkt. 90 ¶ 44 ("Prior Compl.") ("Defense Distributed *has and will continue to create and possess other files* that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public

forums on the Internet") (emphasis added); *see id.* ¶ 45.

Plaintiffs now challenge the application of the same statute and same implementing regulations (the AECA and ITAR) to "similar 3D printing files related to firearms." Prior Compl. ¶ 45. Plaintiffs again raise the same First, Second, and Fifth Amendment facial challenges to *the entire ITAR regulatory regime*'s regulation of technical data, including 3-D-gun files. *Compare* Prior Compl. ¶¶ 54–56, 60–61 *with* SAC ¶¶ 227, 228, & 239. These claims are barred by claim preclusion.

The supposedly new allegations in this action cannot save Plaintiffs' case from claim preclusion. "'The doctrine of res judicata would become meaningless if a party could relitigate the same issue . . . by merely positing a few additional facts that occurred after the initial suit.'" *Misischia v. St. John's Mercy Health Sys.,* 457 F.3d 800, 805 (8th Cir. 2006) (quoting *Dubuc v. Green Oak Township*, 312 F.3d 736, 751 (6th Cir. 2002)). The alleged new facts fall into two buckets: (1) the additional files that Plaintiffs posted on the internet; and (2) Defendants' conduct that allegedly breached the Settlement Agreement. Neither save Plaintiffs' claims. The ability to post "new" files in the future— such as the April 2021 files—without having to seek a license or other approval was specifically at issue in *Defense Distributed I*: "Defense Distributed *has and will continue to create and possess other files* that contain technical information . . . that Defense Distributed intends to post to public forums on the Internet." Prior Compl. ¶ 44 (emphasis added); *see also id.* ¶ 45. The April 2021 "computer files with digital firearms information" fall well within these prior allegations. Pls.' Mot. at 1.

Allegations that a party breached a Settlement Agreement are not relevant to claim preclusion. *See Instituto Mexicano Del Seguro Soc. v. Orthofix Int'l N.V.*, No. 418-cv-00121-ALM-KPJ, 2018 WL 4561621, at *2 (E.D. Tex. Sept. 24, 2018). In *Orthofix*, the Plaintiff argued that "because Defendant breached the settlement agreement, Plaintiff is entitled to reassert its original claims." *Id.* at *1. The *Orthofix* court disagreed, explaining that "Plaintiff's argument fails because it rests solely on inapplicable state law cases governing settlement agreements entered into outside of litigation, where no *res judicata* was involved. . . . 'The preclusive effect of a prior federal court judgment is controlled by federal *res judicata* rules.'" *Id.* (quoting *Ellis v. Amex Life Ins. Co.*, 211 F.3d 935, 937 (5th Cir. 2000)).

Claim preclusion applies with even more force here because Plaintiffs already tried—and

22

failed—to re-open the underlying *Defense Distributed I* litigation after the *Wash. I* court issued an injunction. *See Defense Distributed I*, Dkt. 136, 1:15-cv-372-RP, *aff'd* 947 F.3d 870 (5th Cir. 2020). Both this Court and the Fifth Circuit held that the State Department's compliance with the *Wash. I* injunction was an inadequate basis to set aside the judgment, as plaintiffs were sophisticated parties who knew that an APA suit could lead to the Government being enjoined from compliance with the settlement and had failed to ask the district court to retain jurisdiction over the settlement. *Id.*

      B.    <u>Plaintiffs' constitutional claims have been released.</u>

As part of the Settlement Agreement, Plaintiffs agreed to an extraordinarily broad release of liability. Plaintiffs released Defendants from all claims "whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action." Settlement Agreement ¶ 3. The claims here fall easily within that release provision.

The Fifth Circuit "employ[s] a two-step burden-shifting framework to assess a waiver's validity and enforceability[.]" *Clayton v. ConocoPhillips Co.*, 722 F.3d 279, 292 (5th Cir. 2013). "Once a party establishes that his opponent signed a release that addresses the claims at issue, received adequate consideration, and breached the release, the opponent has the burden of demonstrating that the release was invalid because of fraud, duress, material mistake, or some other defense." *Id.* Here, there is no question that Plaintiffs signed the release, that the release covers the claims at issue, and that Plaintiffs breached the release by reasserting the same claims again this action.

The release is valid. "[B]ecause a release is contractual in nature, it is interpreted in the same manner as any other contract term or provision." *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009). "If the provisions of a release are 'clear and unambiguous, they must be given their plain and ordinary meaning.'" *Holland v. United States*, 621 F.3d 1366, 1378 (Fed. Cir. 2010) (quoting *Bell BCI*, 570 F.3d at 1341); *see CIC Prop. Owners v. Marsh USA, Inc.*, 460 F.3d 670, 673 (5th Cir. 2006) (a release of known and unknown claims 'that have been or could have been brought' was enforceable, and precluded claim brought by plaintiff after an agreement was executed).

The release covers the claims raised in this litigation. In *Defense Distributed* I, Plaintiffs

challenged the constitutionality of the ITAR as applied to 3-D-gun files in general.   Prior Compl. ¶ 44.  So while plaintiffs now point to different 3-D-gun files, the core claim is the same: that the ITAR's regulation of the technical data of 3-D-guns violates the First, Second, and Fifth Amendments.  These constitutional claims were raised in *Defense Distributed I* and released by the Settlement Agreement.

Plaintiffs have not met their burden to show why the release would be invalid.  They have not alleged fraud, duress, or material mistake. *Clayton*, 722 F.3d at 292; *see generally* SAC and Pls.' Mot.  And they are unlikely to succeed on their argument that State materially breached by complying with federal court orders in *Wash. I* and *II*.   *See supra*, II. Regardless, this Court lacks jurisdiction to adjudicate State's compliance with the agreement. *Id.*  If Plaintiffs seek to evade the release provision, they must first obtain a judgment from the Court of Federal Claims.

The current lawsuit is barred both by the *res judicata* effect of the earlier dismissal with prejudice and the release language in the Settlement Agreement.  The Fifth Circuit's decision in *Oreck Direct, LLC v. Dyson, Inc.*, 560 F.3d 398, 401 (5th Cir. 2009) is instructive.  Oreck sued its vacuum-cleaner competitor Dyson, alleging that the "no loss of suction" representation was false. *Id.* at 400.  The parties eventually settled and dismissed the case with prejudice. *Id.*  Two years later, Oreck sued Dyson again alleging that that the "no loss of suction" representation was false for Dyson's DC18 model. *Id.* The District Court granted summary judgment for Dyson, finding that the "no loss of suction" claim was barred by claim preclusion, rejecting Oreck's argument that the specific model was not at issue in the prior case. *Id.* The Fifth Circuit affirmed. *Id.*  The Court explained that a dismissal with prejudice that did not incorporate the terms of the Settlement Agreement into the judgment barred *any* claim under the Lanham Act that related to the contested claim, even if a particular model was not named. *Id.* at 404.  The Court also held that even if the Settlement Agreement, rather than the final judgment, controlled the *res judicata* analysis, the claims would *still* be barred because they were ones that were or could have been brought prior to the settlement, and were thus covered by the broad release language in the agreement. *Id.* at 404, n.8.  So too here.

24

**IV.     Plaintiffs Are Not Likely To Succeed On The Merits Of Their Constitutional Claims.**

Because Plaintiffs have failed to establish jurisdiction for injunctive relief at this stage, or carry their burden of persuasion on the balance-of-equities and public-interest factors, they are not entitled to a preliminary injunction, and this Court need not proceed to the merits of Plaintiffs' claims.  If this court does consider the merits, however, Plaintiffs have also failed to "clearly carry the burden of persuasion" that they are likely to succeed on merits of their constitutional claims.  *Def. Distributed I*, 121 F. Supp. 3d at 688.

A.     Plaintiffs forfeited their arguments on the merits of their constitutional claims by failing to develop them.

Plaintiffs argue that they are likely to succeed on the merits of their First Amendment claim, Pls.' Mot. at 32–34, but their brief is entirely devoid of legal analysis on this claim.  *Id.* at 32–34.[5]  The brief recites various legal tests without any argument about how the standard applies to the ITAR. Plaintiffs do not, for example, explain how the ITAR operates as a prior-restraint, why it constitutes a content-based restriction, or how it is overbroad.  This is especially inexcusable given that Plaintiffs filed a 40-page brief—nearly twice the usual page limit allowed by the local rules—only eight pages of which comprise the brief's argument section.  *See Wise v. Wilkie*, 955 F.3d 430, 437–38 (5th Cir. 2020) (claim forfeited by failure to "adequately raise" issue in brief and noting that raising an argument in a "reply brief" "is too little too late").  By failing to develop their First Amendment argument, Plaintiffs have forfeited any claims seeking a preliminary injunction based on this claim.  The burden is on Plaintiffs to show a likelihood of success on their claim that the First Amendment applies to the categories of 3-D-firearm files that they wish to protect.  *Def. Distributed*, 121 F. Supp. 3d at 688. Plaintiffs cannot satisfy their burden of persuasion in a section devoid of legal argumentation, and, as such, have failed to make the requisite showing to obtain a preliminary injunction based on their First

---

[5]  Plaintiffs purport to bring an as-applied constitutional challenge to "the State Department's application of ITAR controls to Defense Distributed's April 2021 files."  Pls.' Mot. at 33–34. But Plaintiffs have waived any such challenge by failing to provide sufficient evidence about the nature of any their files or of State's application of ITAR controls to their files.  Defendants accordingly address this as a facial constitutional challenge to the ITAR regulations.

Amendment claim.[6]

    B.    <u>Export controls on functional files that operate to create a firearm or its component parts do not violate the First Amendment.</u>

Plaintiffs' central claim appears to be that the files they seek to export are nothing more than speech, and thus that any restriction on their export necessarily violates the First Amendment.  To the extent the Court determines to reach that argument at this stage, it should find that Plaintiffs have not established a likelihood of success on the merits.

As an initial matter, the First Amendment does not protect all types of conduct, information, or communications.  There is no serious dispute that if Defense Distributed had assembled numerous small-caliber firearms and shipped them abroad that the Government's regulation of that activity would not implicate the First Amendment.  The same goes for Plaintiffs' enabling of persons abroad or foreign actors in the United States to build their own firearms through export of functional files.

Conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment.  *See United States v. O'Brien,* 391 U.S. 367, 376 (1968); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech.").  Indeed, the Supreme Court has "rejected 'the view that an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea.'"  *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *O'Brien,* 391 U.S. at 376).

It follows, then, that not every action intended to be communicative is properly considered expressive speech that is protected by the First Amendment.  Likewise, not every exchange of data is necessarily expressive; and a law that regulates the export of functional items does not necessarily regulate speech.  "To determine whether particular conduct possesses sufficient 'communicative

---

[6] Plaintiffs additionally state that the State Department's alleged breach of contract "in one fell swoop violated contract *and* the APA *and* the Due Process Clause."  Pls.' Mot. at 34 (emphasis in original).  Plaintiffs' assertion is not supported by any argument or legal authority.  In any event, this claim lacks merit because the State Department did not breach the Settlement Agreement.

element's to be embraced by the First Amendment, courts look to whether the conduct shows an 'intent to convey a particular message' and whether 'the likelihood was great that the message would be understood by those who viewed it.'" *Steen*, 732 F.3d at 388 (quoting *Johnson*, 491 U.S. at 404).

Plaintiffs have not carried their burden to prove that the First Amendment applies to functional files that direct 3-D printers to produce firearms and their components. Most simply, Plaintiffs failed to make any argument about whether the 3-D-gun files they wish to protect have sufficient communicative elements, convey a particular message, or would be understood by those who viewed it as being expressive. Setting that forfeiture aside, the ITAR's export controls over technical data like the 3-D-gun files are not regulations of expressive conduct. Files for 3-D printing guns specifically direct a machine to manufacture a firearm or defense articles; the information conveyed by the files is fully functional (non-expressive) because it performs a task unrelated to the communication of ideas.[7]

Defendants recognize that several courts have held that code can, in some instances, amount to speech. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–49 (2d Cir. 2001). But whether it does so is highly context specific. *Id.* at 448 n.20 (distinguishing holding from previous Second Circuit case and other situations where "a human's mental faculties do not intercede in executing the instructions"), *id.* at 449 (confirming that code used to communicate to a program user is "not necessarily protected" and that code used to communicate to a computer is "never protected"). Given the importance of this question, it is entirely appropriate for this Court to refrain from reaching it where Plaintiffs have made no attempt to develop their First Amendment argument in their brief. *Cf. Nation Magazine v. Dep't of Def.*, 762 F. Supp. 1558, 1572 (S.D.N.Y. 1991) (refraining from deciding, absent "a full record," constitutional questions regarding the First Amendment and military interests abroad).

But as an initial matter, because the files regulated for export by the ITAR operate as fully

---

[7] Should this Court conclude that the files regulated by the ITAR are not expressive at all, the appropriate standard of review would be rational-basis scrutiny, which the ITAR satisfies for the reasons explained in the next section. *See Steen*, 732 F.3d at 392 (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

functional files that direct the manufacture of 3-D weapons, the ITAR controls are not a regulation of speech within the meaning of the First Amendment.  Thus, Plaintiffs are not likely to succeed on the merits of their argument that State's regulation of this technical data violates the First Amendment.

C.   The ITAR is a content-neutral regulation of technical data that directly facilitate the manufacture of defense articles or their component parts.

Even if the ITAR export controls over technical data were considered to have an impact on expression, they still would not violate the First Amendment.  The ITAR's regulation of the export of technical data that directly facilitates the manufacture of certain 3-D weapons is a valid, content-neutral regulation because this regulation is not directed towards the content of speech but rather towards the conduct of exporting, without a license, an items that functions to produce and proliferate defense articles.  *See Def. Distributed*, 121 F. Supp. 3d at 694.

When "'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376; *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) (applying *O'Brien* scrutiny to FCC rules that governed how "[c]able programmers and cable operators engage in and transmit speech").  In addition, where the Government's purpose in imposing a regulation is "justified without reference to the content of the regulated speech," such regulation is likewise content-neutral.  *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

The Supreme Court has determined in varied contexts that a government regulation that implicates speech, but is not directed toward regulating that speech, is a content-neutral regulation. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 479 (2014); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986).  Indeed, as this Court previously recognized, "the Supreme Court has found regulations to be content neutral where the regulations are aimed not at suppressing a message, but at other 'secondary effects.'" *Defense Distributed I*, 121 F. Supp. 3d at 693–94.  In making these determinations, courts should "administer our content-regulation doctrine with a dose of common sense." *Reed*, 576 U.S. at 183 (Kagan, J., concurring in the judgment).

The ITAR regulates the conduct of exporting defense articles for the purpose of "further[ing]" world peace [and] the [national] security and foreign policy interests" of the United States, 22 U.S.C. § 2778(a)(1), including the conduct of exporting technical data consisting of files that function to produce certain weapons or other defense articles without a license or approval.  The ITAR does not regulate the export of such files because of the expressive content of the files or to censor a particular point of view; it is regulating the export of these files because of their functionality and potential for harm.  Put another way, the ITAR's controls over physical defense articles, such as missiles, explosives, or submarines, do not regulate such exports based on their potential to express a certain viewpoint; the same is true of parallel controls over related technical data.  In that way, the ITAR regulates conduct and its potential for harm, and physical defense articles cannot be effectively regulated without the exercise of control over related technical data.  Here, technical data in the form of 3-D gun files that facilitate the automated manufacture of firearms and their components are regulated in the same manner as technical data for manufacturing explosives or missiles.[8]

The ITAR's regulation of technical data is essential to its regulation of the export of defense articles, and is unrelated to the suppression of free expression and is justified without reference to the content of the speech.  *Cf. Reed*, 576 U.S. at 164.  The ITAR regulates, *inter alia*, the export of files that direct a device to carry out an automated task of manufacturing a defense article.  Whatever expressive value may exist in the theory of such files, they indisputably function to create a controlled weapon.  Thus, the ITAR may restrict their export on the basis of the literal functionality to create the very defense articles are indisputably restricted for export.  This regulatory scheme is not the product of government hostility toward the spread of ideas about 3-D printing of firearms, but rather regulating the means to easily manufacture defense articles described in the USML, through 3-D printing or otherwise.  Accordingly, any ITAR limits on the export of Defense Distributed's files are not directed at the content of expression.  *See Def. Distributed I*, 121 F. Supp. 3d at 694; *see also United States. v. Chi*

---

[8] It is inconsequential as a First Amendment matter that an individual must take additional actions such as providing raw materials for the production of the 3-D weapons. Pls.' Mot. at 7.  That conduct is not speech and "does not diminish the nonspeech component of [computer] code," *Corley*, 273 F.3d at 451, or change the object of the government's regulation: the conduct of exporting arms by providing the means for firearms to be produced abroad.

*Mak*, 683 F.3d 1126, 1134-35 (9th Cir. 2012) ("AECA prohibits export without a license of items on the USML without regard to content or viewpoint . . . defines [ ] technical data based on its *function*," and is therefore "content-neutral") (emphasis in original); *United States v. Edler Indus.*, 579 F.2d 516, 520 (9th Cir. 1978) (recognizing the equivalence for arms control purposes of "military equipment" and the "blueprints specifying the construction of the very same equipment"); 22 C.F.R. § 121.1[9]  As such, the ITAR regulations at issue here are content- and viewpoint-neutral regulations, which further an important governmental interest.

Plaintiffs nonetheless invoke *Reed v. Town of Gilbert* as support for their assertion that the ITAR regulation imposes "content-based speech restrictions." Pls.' Mot. at 33. But this case is nothing like *Reed*. In *Reed*, the Supreme Court considered a First Amendment challenge to a city sign code that applied differing requirements to certain signs depending upon whether the sign in question qualified as an "Ideological," "Political," or "Temporary Directional" sign. *Reed*, 576 U.S. at 164. Unsurprisingly, the Court concluded the sign code was "content based on its face" because the restrictions in the code "depend[ed] entirely on the communicative content of the sign." *Id.* In the words of the concurrence, the code did "not pass strict scrutiny, or intermediate scrutiny, or even the laugh test." *Id.* at 184 (Kagan, J., concurring in the judgment). The viewpoint-based distinctions drawn by the sign code in *Reed* stand in obvious contrast to the ITAR's regulation of functional files.

Nor is it a response to argue that *Reed* applies because the ITAR "defin[es] regulated speech by a particular subject matter[,] … function[,] or purpose." *Reed*, 576 U.S. at 163 (citing *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). The terms "subject matter," "purpose," and "function"

---

[9] Technical data is controlled in all 21 categories of the USML. *See* 22 C.F.R. § 121.1, Categories (and paragraphs): I(i) (related to certain firearms), II(k) (related to certain guns, flame throwers, kinetic energy weapons, etc.), III(e) (related to ammunition/ordnance), IV(i) (related to missiles, etc.), V(j) (related to explosives, etc.), VI(g) (related to surface vessels of war, etc.), VII(h) (related to certain ground vehicles), VIII(i) (related to certain aircraft, etc.) , IX(e) (related to military training equipment, etc.), X(e) (related to personal protective equipment), XI(d) (related to military electronics), XII(f) (related to fire control and laser systems, etc.), XIII(l) (related to certain cryptographic systems, certain materials, and more), XIV(m) (related to toxicological agents), XV(f) (related to spacecraft, etc.), XVI(e) (related to nuclear weapons related articles), XVII(a) (related to classified articles), XVIII(g) (related to directed energy weapons); XIX(g) (related to gas turbine engines, etc.); XX(d) (related to submersible vessels, etc.); XXI(b) (related to future-designated articles).

cannot be construed so broadly as to transform any focused regulation with an alleged incidental effect on speech into a content-based restriction on speech. *Reed* is not to the contrary, and indeed, the facts of the case and the Court's discussion of content-neutral alternatives confirms that a focused regulation is not content based simply because the regulation pertains to a specific subject matter. At issue in *Reed* was a law about signs—which are undoubtedly communicative—and subject-matter specific regulation (i.e., a law about signs instead of murals). But the court did not conclude that the law was content based because it was a subject-matter regulation of signs, but rather because it drew obvious distinctions based on the *message* conveyed by the sign. *Id.* at 164. And even in that context, the Court blessed content-neutral alternatives, including regulating the "size, building materials, lighting, moving parts, and portability" of signs. *Id.* at 173. Accordingly, to assert that any regulation of a specific subject matter—here, functional 3-D-guns files—is a content based restriction would "stretch a number of First Amendment doctrines well beyond the sort of activities these doctrines protect." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 70 (2006). That conclusion also makes good sense: "States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist." *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1994)).

Defense Distributed does not dispute that the Government has an important national security interest in preventing entities from evading the licensing requirements for the export of arms or the means of producing firearms abroad. As both this Court and the Fifth Circuit held, the "stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest." *Def. Distributed*, 838 F.3d at 458; Miller Dec. ¶¶ 75–78. One court aptly summarized the magnitude of the national security interest in the "licensing and approval mechanisms set forth in the AECA and ITAR," including "digital plans for 3D-printable plastic firearms, undetectable by metal detectors and untraceable without registration and serial number, privately generated technical data for delivery systems for weapons of mass destruction, such as rockets and missiles, created by defense contractors, and

technical data related to chemical and biological agents that could be adapted for use as weapons." *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210–11 (S.D.N.Y. 1016), *aff'd*, 673 F. App'x 93 (2d Cir. 2016).

In sum, any ITAR regulation of the export of technical data, including functional 3-D files, furthers a substantial governmental interest in regulating the dissemination of the means to produce defense articles to foreign persons or countries.  Because those export controls satisfy intermediate scrutiny under the First Amendment, Plaintiffs are unlikely to succeed on the merits of their First Amendment claim.

> D.    This regulation also satisfies strict scrutiny.

Even if strict scrutiny were to apply, Plaintiffs are still unlikely to succeed on the merits. Plaintiffs rely solely on the Supreme Court's decision in *Reed v. Town of Gilbert* to argue that "the State Department's application of ITAR controls to Defense Distributed's April 2021 Files violates the First Amendment doctrine regarding content-based speech restrictions."  Pls.' Mot. at 33.  As explained above, this argument fails on its own terms because the files at issue are not mere expressive content but function to operate a printer to manufacture a weapon, and thus control of their export is unrelated to the suppression of ideas.  But even if the regulation could be considered a content-based regulation of speech, the Government's compelling interests justify the regulation under even a strict-scrutiny analysis.  *See Holder v. Humanitarian L. w Project ("HLP")*, 561 U.S. 1 (2010).  In considering a First Amendment challenge to the material-support of terrorism statute, 18 U.S.C. § 2339B(a)(1), the Supreme Court emphasized that the statute "implicate[d] sensitive and weighty interests of national security and foreign affairs."  *Id.* at 33–35.  The Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not."  *Id.* at 35.  Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination"

of what is "necessary." *Id.*[10]

The ITAR's licensing requirements further the Government's compelling interests. Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1).   In longstanding regulations, the State Department has consistently and reasonably concluded that the overseas dissemination of arms cannot meaningfully be curtailed if unfettered access to technical data essential to the production of arms is not similarly subject to the export licensing scheme. *See* 22 C.F.R. §§ 120.6, 120.10.[11] The statutory and regulatory regime likewise confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35.

The ITAR's licensing requirements are narrowly tailored to further those compelling interests. For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36).  The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles."  22 C.F.R. § 120.10(b).  Also excluded is information within the public domain.  *Id.*[12]  And, of course, the ITAR restricts only the *export* of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally." *Defense Distributed I*, 121 F. Supp. 3d at 695.  Plaintiffs did just that in 2018, Pls.' Mot. at. 9, and they indicated that they are

---

[10] Plaintiffs assert that the State Department must provide empirical support of the efficacy of its export regulations, but that standard was not used by the Supreme Court in *Humanitarian Law Project* where "sensitive interests in national security and foreign affairs [are] at stake." *HLP*, 561 U.S. at 36.
[11] Plaintiffs argue in passing that the government can only prohibit speech to prevent illegal conduct when the speech is "integral to criminal conduct." Mot. at 33–34.  But the State Department has reasonably concluded otherwise, and that judgment is entitled to deference.
[12] Public domain is broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11.

presently electronically distributing files within the United States while still restricting access to their files so as not to export their files internationally.  Wilson Decl. at 2, Dkt. 152-1.

The Fifth Circuit likewise affirmed that "the State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *Def. Distributed*, 838 F.3d at 458.  Plaintiffs provide no basis to disturb conclusions about the Government's sensitive interests previously affirmed by this Court and the Fifth Circuit.  Because the ITAR regulations satisfy even strict scrutiny, Plaintiffs are unlikely to succeed on the merits of their First Amendment claim.

E.     ITAR's export controls are not an unconstitutional prior restraint.

Plaintiffs' claim that the "State Department's application of ITAR controls" to the April 2021 files constitutes a prior restraint likewise does not have a substantial likelihood of success on the merits.  Pls.' Mot. at 33.  This Court previously rejected that claim and should do so again.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988).  For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.*  By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of censorship." *Id.* at 760–61.  The ITAR provisions at issue fall squarely in this latter category.  The AECA and ITAR are part of a scheme designed to curtail the unfettered spread of defense articles abroad and to foreign nationals, including files that directly facilitate the 3-D printing of firearms.  Far from being aimed at

restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

The conduct of exporting computer files stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are typically done for expressive purposes. Cases involving restrictions on such activities are therefore inapposite here. *See, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). For this reason, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Maryland*, 380 U.S. 51, 52 n.2, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, for example, "moral" expression raise a concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4 LLC*, 541 U.S. 774, 782–83 (2004) (upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content

of expression, moral or otherwise. Accordingly, Plaintiffs are unlikely to succeed on their First Amendment claim that the regulations operate as a prior restraint.

> F.     The ITAR's export controls are not unconstitutionally overbroad.

Plaintiffs also allege that the "State Department's application of ITAR controls to Defense Distributed's April 2021 Files violates the First Amendment doctrine regarding overbreadth." Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  In circumstances where a regulation is alleged to be so broad that it is incapable of any permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).  Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615.

Here, Plaintiffs' overbreadth claim cannot meet these standards.  First, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *United States v. Hicks*, 980 F.2d 963, 969 (5th Cir. 1992) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).  Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves.  *Id.*  Here, as the Supreme Court observed in *Brockett*, "[t]here is . . .  no want of a proper party to challenge the [regulations], no concern that the attack on the [regulations] will be unduly delayed or protected speech discouraged."  472 U.S. at 504.

Second, even if this Court reaches the merits of Plaintiffs' overbreadth claim, the ITAR's export controls on technical data have a plainly legitimate purpose.  Plaintiffs have not attempted to demonstrate that the regulations have been applied in a substantial number of impermissible ways. To the contrary, the regulations serve the vital purpose of preventing the circumvention of export

controls on defense articles by the method of providing foreign powers or persons the technical know-how, instructions, blueprints, or—as in the instant case—the automated processes to produce such defense articles.  Further, the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out an exemption for "public domain" data that helps ensure their reach is appropriately limited.  *See* 22 C.F.R. § 120.10(b).  For these reasons, there is simply no substantial overbreadth here, and Plaintiffs are not likely to succeed on the merits of their claim.  *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge).

## V.      Plaintiffs Cannot Satisfy the Balance Of Harms Or Public Interest Prongs

This Court has already ruled that Plaintiffs have not satisfied the balance of harms or the public interest requirements necessary for a preliminary injunction.  *Defense Distributed I*, 121 F. Supp. 3d 680 (W.D. Tex. 2015), *aff'd* 838 F.3d 451 (5th Cir. 2016).  When a plaintiff seeks an injunction against the federal government, the balance-of-equities and public-interest factors "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  If a plaintiff fails to carry its burden on the balance-of-equities and public-interest factors, it is not entitled to a preliminary injunction, and a court need not proceed to the merits of the claim.  *Defense Distributed I*, 838 F.3d at 460–61.  Here the Court must balance the purported violation of a constitutional right against advancing important U.S. national security and foreign policy interests, including controlling the export of defense articles abroad.

The balance of harms has not materially changed since this Court last analyzed this question in 2015.  Once again, Plaintiffs failed "to give *any* weight to the public interest in national defense and national security[.]" *Defense Distributed I,* 838 F.3d at 455.  "While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles."  *Defense Distributed I*, 121 F. Supp. 3d at 689.  "It also fails to account for the interest — and authority — of the President and Congress in matters of foreign policy and export." *Id.* at 689–90 (citing *Haig v. Agee*, 453 U.S. 280, 292 (1981); *United States v. Pink*, 315 U.S. 203, 222–23 (1942); and *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011)).  Plaintiffs point to no new facts that change that analysis in their favor.

Interim factual developments only cut against Plaintiffs. The purported burden on plaintiffs is narrower. There is no dispute that Plaintiffs can create, possess, and distribute 3-D-gun files electronically within the United States—Plaintiffs have been doing all of these things. Pls.' Mot. 9–11. So the only purported violations of their rights relates to posting files publicly where they can be accessed by non-U.S. persons or persons outside the United States. This narrow burden must be weighed against the Government's interests in national security, foreign relations, and commerce. Nothing since this Court's last analysis diminishes the Government's interest. Miller Dec. ¶¶ 75–78. And if anything the Ninth Circuit's recent opinion provides *additional* authority as to why foreign policy decisions like export controls weigh heavily in any balancing of harms because Congress placed them outside of judicial review. *Washington II*, 2021 WL 1621320, at *8 ("Congress precluded judicial review of both the designation and undesignation of items as defense articles" under the ITAR; and "Congress not only barred APA challenges to Commerce's Reform Act functions; it rendered them, in effect, judicially unreviewable."). The burden on Plaintiffs from waiting until the Ninth Circuit's mandate is minimal and temporary.

But the entry of an injunction would "cause significant harm to the national security and foreign policy interests of the United States and would undermine the U.S. Government's ability to effectively regulate the export of deadly firearms and their technology." Miller Dec. ¶ 94. Conflicting injunctions would inject "substantial uncertainty and unpredictability into the U.S. export controls system." *Id.* ¶ 94. For example, an injunction could create "a misimpression that these files are not subject to export restrictions at all, including those restrictions maintained by the Commerce Department, and potentially result in the export of files that would facilitate the development of 3D-printed firearms abroad." *Id.* ¶ 92–94. Given the gravity of these harms, and the minimal burden on Plaintiffs, the threatened harm to national security and foreign policy interests outweighs the harm alleged by Plaintiffs. Because Plaintiffs fail to carry their burden on the balance-of-equities and public-interest factors, this Court should deny their request for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be denied.

Dated: May 12, 2021

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ Lisa Newman*
Zachary A. Avallone
Michael Knapp
Lisa Newman
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-5578
Fax: (202) 616-8470
Email: lisa.n.newman@usdoj.gov

*Attorneys for U.S. Government Defendants*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served on the other parties to this action and their counsel of record through electronic filing in the Court's ECF system on May 12, 2021.

/s/ *Lisa Newman*
Lisa Newman