IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § § | Case No. 1:18-cv-637-RP |
| Plaintiffs, | § § | |
| v. | § § | |
| UNITED STATES DEPARTMENT OF STATE, MICHAEL R. POMPEO, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary of Defense Trade Controls; SARAH HEIDEMA, in her official capacity as Director of Policy, Office of Defense Trade Controls Policy, | § § § § § § § § § § § | Plaintiffs' Response to the State Department's Motion to Dismiss |
| and | § § | |
| GURBIR GREWAL, Attorney General of the State of New Jersey | § § § | |
| Defendants. | § | |

## TABLE OF CONTENTS

Table of Contents ........................................................................................................... i

Argument ........................................................................................................................1

I.      The APA and constitutional claims are not moot. ...........................................1

        A.      The State Department failed to satisfy the voluntary cessation test. .......................1

        B.      The State Department's ITAR regime still applies to Plaintiffs' speech. ...............5

        C.      The State Department still controls licensing of the speech at issue. ......................8

II.     Res judicata does not bar any claims. ..............................................................11

        A.      Res judicata assertions never belong in Rule 12 motions. ....................................11

        B.      The prior case did not render a final judgment on the merits. ...............................11

        C.      The requisite claim identity is missing. .................................................................13

III.    The Settlement Agreement did not release later-arising claims about failing to comply with the Settlement Agreement. ............................................................16

IV.     No claims belong at the Court of Federal Claims. ..........................................18

        A.      The Tucker Act does not apply. .............................................................................18

        B.      The State Department waived and/or is estopped from asserting the Tucker Act and sovereign immunity ......................................................................19

Conclusion ....................................................................................................................20

## ARGUMENT

The State Department's motion seeks dismissal by asserting lack of subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6).  The motion should be denied in both respects.  Subject-matter jurisdiction exists and relief can be granted on all the complaint's claims.[1]

## I.      The APA and constitutional claims are not moot.

The State Department begins with a limited mootness argument.  Knowing that there is no mootness problem as to the APA claims for retrospective relief, *see* Dkt. 117 ¶¶ 184-215, 330-337, the constitutional claims for retrospective relief, *see id.* ¶¶ 225-254, 330-337, and the breach of contract claims, *see id.* ¶¶ 216-224, 330-337, the State Department argues only that the APA and constitutional claims for *prospective relief* are moot.  Dkt. 162 at 1, 9-14.  It says that mootness has occurred because the "State no longer regulates 3D gun files" and "Plaintiffs cannot seek relief from a regulation that no longer applies to them or against an agency that no longer regulates their conduct."  Dkt. 162 at 1, 9-14.  The mootness argument fails for several independent reasons.

### A.      The State Department failed to satisfy the voluntary cessation test.

First, the motion's mootness argument should be rejected because of a key doctrinal failure.  The real question presented is not the simple mootness inquiry the State Department presents.  The real question presented is of voluntary cessation—a distinct aspect of mootness doctrine with a demanding test that the State Department bears the burden of satisfying and has failed to meet.

---

[1] The motion seeks Rule 12 relief by asserting the affirmative defenses of *res judicata* and release.  That is appropriate only if parties consent to converting this motion to dismiss to a motion for summary judgment, *see, e.g.*, *Test Masters Educ. Services, Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005), and Plaintiffs object to any such conversion.  *See infra* Parts II.A & III.

Well-established precedent distinguishes mootness in general from voluntary cessation. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam) (some internal quotation marks omitted))). But "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Id.* "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Id.* Hence, "'a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (*quoting Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

Under this framework, the Plaintiffs bear no burden of defeating voluntary cessation. Their burden was to establish standing at the case's outset, *id.*, which they did by showing Article III standing for every claim at issue  when the live complaint was filed in November 2020.  In particular, standing existed (the case was not moot) at inception because the supposedly-mooting regulatory changes did not take effect until *after* the complaint was filed.  The complaint alleges this, Dkt. 117 ¶ 130, and the State Department concedes it, Dkt. 162 at 5-7.

Thus, since the supposedly-mooting events happened *after* the case had undoubtedly been initiated with standing, the applicable doctrine becomes voluntary cessation and the State Department bears the "formidable burden" of making it "absolutely clear" that the wrongdoing at issue "could not reasonably be expected" to resume.  *Already, LLC*, 568 U.S. at 92-95.  The State Department has failed to carry its voluntary-cessation burden for a litany of reasons.

First, the Court should reject voluntary cessation's application to this case because the State Department did not make the argument.  Unlike the standing in the first instance (not at issue here), mootness due to supposed voluntary cessation is *not* a jurisdictional issue requiring *sua sponte* attention.  *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("voluntary cessation  . . . is a matter relating to the exercise rather than the existence of judicial power").  Courts should address voluntary cessation only if the opponent properly raises the issue, and the State Department did not do so.  The Court should reject the doctrine for that reason alone.

Second, the Court should reject voluntary cessation's application to this case because the State Department has failed to carry the "heavy burden" of making it "absolutely clear" that the federal government will not soon undo or alter the 2020 regulatory changes.  A real evidentiary showing is needed, *see Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017),[2] and the State Department has made none at all.

Third, the Court should reject voluntary cessation's application to this case because the State Department has never supplied the "controlling statement of future intention" that precedent requires.  *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020).  A government brief representing that it "as no plans to and will not, reenact the former policies" is *not* enough.  *Id.* "Sworn testimony" could suffice, *id.*, but there is none here.  To the contrary, credible indications show that federal efforts to undo the 2020 regulatory changes are underway at this very moment.  Over sixty Senators and Congressmen are already expressly urging the President to undo the 2020

---

[2] This Court has never given public officials a blanket presumption of voluntary cessation, especially not in the extraordinary circumstances posed here.  *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020).  And recent Supreme Court precedent indicates that no such special solicitude is appropriate.  *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017).  Just like all other litigants, governments bear the "heavy burden" of making cessation "absolutely clear" without the help of any thumb on the scale.  *See id.*

regulatory changes that supposedly cause mootness.  Senator Markey said so to President Biden in no uncertain terms:

> A recent decision by the United States Court of Appeals for the Ninth Circuit threatens to allow the immediate online distribution of blueprints for three-dimensional ("3-D") printable firearms. Downloadable gun technology is profoundly dangerous, allowing anyone to build untraceable firearms on demand. We urge your Administration to promptly take administrative action that will keep in place strict regulatory controls over these weapons — and the technical data for their manufacture — and prevent their proliferation. . . .

> We therefore urge your Administration, through further proceedings under the Administrative Procedure Act, to undo the Trump rulemakings. It is entirely within the power and authority of your Administration to transfer regulatory control over 3-D printed firearms and their technical data back to the State Department, return them to the Munitions List, and once again control them under ITAR — a regulatory scheme that makes sense. And your Administration can take these steps without the need for legislation or congressional approval. [3]

Fourth, the Court should reject voluntary cessation's application to this case because of "suspicious timing."  *See Speech First, Inc.*, 979 F.3d at 328.  Rather than employ regular procedures, the State Department's efforts to enact and defend the regulations at issue have been incomplete and unjustifiably delayed in ways that seriously prejudiced the Plaintiffs.  Dkt. 117 ¶ 107 ("Defense Distributed and SAF demanded that the State Department appeal [the first *Washington* case]. . . . Even though the State Department had a right to appeal the final judgment, and even though it had preserved arguments that would have succeeded in having the district court's judgment vacated or reversed, the State Department refused to appeal. It let the deadline for that appeal come and go without taking any appellate action. The State Department refused to

---

[3] Letter of Senator Edward J. Markey et al., to President Joseph R. Biden (May 5, 2021), *available at* https://bit.ly/3ASAfbD.  Judicial notice of letters between federal lawmakers is entirely proper and should be taken here.  *See* Fed. R. Evid. 201; *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 366 n.8 (D.C. Cir. 2017).

appeal this final injunction because of partisan politics and in spite of federal legal advisors that deemed an appeal legally necessary.").

Fifth, the Court should reject voluntary cessation's application to this case because of the State Department's "continued defense of the challenged policies."  *See Speech First, Inc.*, 979 F.3d at 328.  Just as in *Speech First*, voluntary cessation does not apply here because the State Department "is still defending the legality of its original policies."  *Id.*

For all of these reasons, the Court should hold that the State Department bears the burden of establishing voluntary cessation and has failed to do so, in which case the mootness argument can be rejected without more.  Alternatively, if the Court ignores the voluntary cessation test and takes the mootness argument on its own terms, it still fails for multiple reasons.

### B.     The State Department's ITAR regime still applies to Plaintiffs' speech.

The motion's keystone premise is that the 2020 rule changes[4] transferred *all* regulatory jurisdiction over *all* of the speech at issue to the Commerce Department.  *See* Dkt. 162 at 1.  But that is plainly wrong.  Regulatory jurisdiction over much of the speech at issue—speech that gives rise to the APA and constitutional claims for prospective relief—was *not* transferred to the Commerce Department's EAR regime. The scope of computer files still subject to the State Department's ITAR regime is very substantial and the State Department's continued prior restraint on Plaintiffs' constitutional right to publish these files is still very much in controversy.

Both the Commerce Department's and State Department's 2020 final rules establish this. The Commerce Department's final rule explains that it did *not* take over regulatory jurisdiction for "defense articles[5] . . . that are either (i) inherently military and otherwise warrant control on the

---

[4] *See generally* 85 Fed. Reg. 3819 (Jan. 23, 2020) (hereinafter "Final State Department Rule"); 85 Fed. Reg. 4136 (Jan. 23, 2020) (hereinafter "Final Commerce Department Rule").
[5] *See* Dkt. 162 at 2 ("The USML includes both physical articles and 'technical data . . . directly related' to those articles.").

USML or (ii) if of a type common to nonmilitary firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States."  Final Commerce Department Rule, 85 Fed. Reg. at 4137.  "If a defense article satisfies one or both of those criteria, it remained on the USML," *id.*, and under the State Department's regulatory authority.  *See id.* at 4138 ("The firearms that warrant ITAR control will continue to be subject to the AECA and its requirements as applicable.").  The State Department's final rule accords, explaining the wide swath of retained regulatory jurisdiction over many articles in Category I:

> With respect to revisions of Categories I–III, the review was focused on identifying the defense articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States. If a defense article satisfies one or both of those criteria, *it remained on the USML.*

Final State Department Rule at 3820 (emphasis added).

In particular, 3D files for fully automatic firearms, silencers, and certain other articles were not transferred to the Commerce Department and remain subject to State Department regulation. ITAR USML Category I(i) continues to control technical data on firearms, to include 3D files, for the following items presently described on the USML relevant to the present action:

- "Fully automatic firearms to .50 caliber (12.7 mm) inclusive" described at USML Cat. I(b);

- "Firearms specially designed to integrate fire control, automatic tracking, or automatic firing" described at USML Cat. I(c);

- "Silencers, mufflers, and sound suppressors" described at USML Category I(d);

- "Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in [USML Category I paragraphs (b) and (d)]" described at USML Category

I(g);

- Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds" described at USML Category I(h);

- Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm" described at USML Category I(h);

- "Parts and components specially designed for defense articles described in paragraphs (c) and (e) of [USML Category I]" described at Category I(h); and

- "Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor" described at Category I(h).

*See* 22 C.F.R. § 121.1.

Computer files for fully automatic firearm parts (as presently described under USML Category I) were part of Plaintiffs' action against the State Department from the very beginning, when Defense Distributed requested government permission to publish a CAD file for a fully automatic AR-15 receiver in 2014. *See* Dkt. 177 ¶¶ 42-69 (describing the files that Defense Distributed has published in the past and/or plans to publish in the immediate future, including parts of an automatic "VZ-58" rifle; Dkt. 148-1 at 2 (proof of same); Dkt. 148-2 (proof of same); Dkt. 148-6 (proof of same).[6]  Despite the brief's categorial denials, the actual rules at issue conclusively establish that the State Department continues to control files giving rise to Plaintiffs' APA and constitutional claims.  *See, e.g.*, Final Commerce Department Rule at 4137 ("squad

---

[6] In addition, the files published by Defense Distributed in April 2021—the very same files that prompted Justice Department attorneys to threaten the Plaintiffs—included sixteen files for suppressors or suppressor components; five auto-sear tool/design files; and seventy-four files for automatic firearm receivers or assemblies.  These 3D files are presently described under USML Category I(e).

automatic weapons do not generally have such non-military uses and will remain controlled on the USML"); *id.* ("A fully automatic weapon is subject to the ITAR.").

### C.      The State Department still controls licensing of the speech at issue.

The State Department does not just err in its understanding of what speech the 2020 regulatory changes moved out of the State Department's domain.  It also has an errant view of what the State Department can still do to speech that did generally move under the EAR regime. This too is an error substantial enough on its own to defeat the mootness argument.

The motion says that, with respect to speech now covered by the EAR regime, the State Department has no more regulatory power whatsoever.  But the Commerce Department's authority over such speech is *not* exclusive.  It is *overlapping*.  Regulatory power over this speech resides with *both* the Commerce Department *and* the State Department.  For these computer files, the State Department retains substantial control over licensing issues that are central to the complaint.

One relevant kind of continuing State Department power concerns the process of obtaining an EAR license.  The 2020 rule changes do not exclude the State Department from this process. To the contrary, the rules make the State Department intimately involved in the decision of whether to issue EAR licenses.  As the Department of Commerce itself explains, applications for EAR licenses entail "an interagency review process that *includes review by the Departments of State*, Defense, and Energy."  Final Commerce Department Rule, 85 Fed. Reg. at 41378 (emphasis added).  In this way, the State Department continues to exercise power over which licenses "will be approved."  *Id.*[7]

---

[7] Regarding license reviews, Executive Order 12981 of December 5, 1995 authorizes the Department of State to review any export license application submitted to the Department of Commerce.  *See* 22 C.F.R. 750.3(b)(1) (noting State Department authority "to review any license application submitted under the EAR.");  85 Fed. Reg. 3819, 3821 (January 23, 2020) ("The Department will continue to advance its foreign policy mission by reviewing all license

Another relevant kind of continuing State Department power concerns the role that ITAR licenses play vis-à-vis the EAR. Even as to speech that the 2020 regulatory changes generally moved to the Commerce Department's EAR regime, the State Department still retains a critical licensing power by virtue of the 22 C.F.R. § 120.5(b) provision about grandfathering existing licenses: "A license or other approval (see § 120.20) from the Department of State granted in accordance with this subchapter *may also authorize the export of items subject to the EAR*." 22 C.F.R. § 120.5(b) (emphasis added).  Because of this provision, speech that is now subject to the EAR may be published not just pursuant to an EAR license, but *also* pursuant an ITAR license. [8] Consistent with this authority and related authority under the Arms Export Control Act,[9] the State

---

applications submitted to the Department of Commerce for the export of firearms and related technology."); 85 Fed. Reg. 4136, 4142 (January 23, 2020) ("all requests for export licenses for firearms remain subject to interagency review, including by the Department of State.").  Executive Order 12981 further provides the State Department with the power to escalate agency disagreements in the license review process.

[8] Section 5(a) of Executive Order 13222 of August 17, 2001, as amended by Executive Order 13637 of March 8, 2013, authorizes the State Department, with Commerce Department consent, to issue licenses for the export of items subject to Commerce Department control: "The Secretary of State is hereby authorized to take such actions and to employ those powers granted to the President by the Act as may be necessary to license or otherwise approve the export, reexport, or transfer of items subject to the jurisdiction of the Department of Commerce as agreed to by the Secretary of State and the Secretary of Commerce."  Executive Order 13637 of March 8, 2013, Sec. 5.

A State Department guidance supports this conclusion: "Licenses for items transitioning to the CCL that are issued prior to the effective date of the final rule for each revised USML category, and that do not include any items that will remain on the USML, will remain valid until expired, returned by the license holder, or for a period of three years from the effective date of the final rule, whichever occurs first, unless otherwise revoked, suspended, or terminated.  State Department Transition Guidance for Revisions to Categories I, II, and III (Jan. 23, 2020) (noting grandfathering of existing State Department licenses for items transitioned to the Commerce Department), available at https://tinyurl.com/ydgv4mrf.

[9] *See* 22 U.S.C. § 2778(k) ("A license or other approval from the Department of State granted in accordance with this section may also authorize the export of items subject to the Export Administration Regulations if such items are to be used in or with defense articles controlled on the United States Munitions List.").

Department has already begun issuing licenses for the export of Commerce Department EAR-controlled items that are exported with ITAR-controlled items.[10]

In this case, both of the State Department's remaining powers over licenses are material. For as the complaint makes clear, the case's APA and constitutional claims are *not* merely about changing the State Department's regulations; the APA and constitutional claims are also about the State Department's failure to issue a license for Plaintiffs' speech, as required by the Settlement Agreement, APA, and Constitution.[11]   The State Department is both illegally negating the Plaintiffs' existing ITAR license and illegally refusing to issue the Plaintiffs an additional ITAR

---

[10] 22 C.F.R. § 120.5(b) ("A license or other approval (see § 120.20) from the Department of State granted in accordance with this subchapter may also authorize the export of items subject to the EAR… that is for use in or with a defense article and is included in the same shipment as any defense article."); 78 Fed. Reg. 22740, 22749 (April 16, 2013) ("The President has provided for this delegation of authority from the Secretary of Commerce to the Secretary of State, and Executive Order 13222 has been amended accordingly (see 78 FR 16129). The Department has revised various sections of, and added certain sections to, the ITAR to accommodate this delegation of authority: ITAR § 120.5 to add a new paragraph (b) to address the delegation… .").

[11] Both sides agree that the Plaintiffs' APA and constitutional claims clearly put the State Department's *regulatory* conduct at issue.  The complaint pleads that the State Department's handling of regulations violates both the APA, Dkt. 117 ¶¶ 188, 189, 190, 191, 196, 197, 198, 199, 204, 205, 206, 207, 212, 213, 214, 215, and the Constitution,  Dkt. 117 ¶¶ 220, 221, 222, 223, 233, 234, 235, 236; 242, 243, 244, 245, 251, 252, 253, 254; and to remedy that wrongdoing prospectively, the complaint seeks a declaration of the wrongdoing's illegality and an injunction against its continuation, Dkt. 117 ¶¶ 331, 333 334, 335; *see also id.* (retrospective damages claim for illegal proscriptions).  The State Department correctly recognizes this aspect of the APA and constitutional claims.  *See* Dkt. 162 at 1.  But there is much more at issue as well.

In addition to *regulatory* change, the Plaintiffs' APA and constitutional claims seek changes in the State Department's *licensing* practices.  Apart from the fight about what regulations should say, the Plaintiffs' APA and constitutional claims say that the State Department's failure to affirmatively license Plaintiffs' speech violates both the APA, Dkt. 117 ¶¶ 186, 187, 191, 194, 195, 199, 202, 203, 207, 210, 211, 215, and the Constitution, Dkt. 117 ¶¶ 218, 219, 223, 231, 232, 236, 240, 241, 245, 248, 249, 250, 254; and to remedy that wrongdoing, the complaint seeks a declaration of the wrongdoing's illegality and an injunction against its continuation, Dkt. 117 ¶¶ 330, 332, 335; *see also id.* (retrospective damages claim for the refusal to license).

license.  Even under the 2020 rules, the State Department has the power to remedy its wrongdoing by a proper exercise of its continuing authority over licenses.  Plaintiffs' request for a judgment making it exercise that power is therefore not moot.

## II. *Res judicata* **does not bar any claims.**

The motion argues that "Plaintiffs' non-contract claims are . . . barred by *res judicata* . . . because they could have been—and in fact were—raised by Plaintiffs in their prior lawsuit," referring to *Defense Distributed I*, No. 1:15-CV-372 in this Court.  Dkt. 162 at 1, 14-17.  The Court should reject this for at least three reasons.

### A. **Res judicata assertions never belong in Rule 12 motions.**

First, the motion is procedurally defective.  The Fifth Circuit has held that "a true res judicata argument (claim preclusion) is an *affirmative defense* that should not be the basis for a 12(b)(6) dismissal."  *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 521 n.8 (5th Cir. 2016).  Nor does res judicata deny the Court subject matter jurisdiction as would support a 12(b)(1) motion to dismiss.  *Smalls v. United States*, 471 F.3d 186, 189 (D.C. Cir. 2006) ("[T]he defense of res judicata, or claim preclusion, while having a somewhat jurisdictional character does not affect the subject matter jurisdiction of the district court.") (citation omitted).  None of the other Rule 12 bases to support a motion to dismiss authorize a *res judicata* defense at the stage, making the assertion of this defense procedurally improper.  *See* Fed. R. Civ. P. 12(b).  The Court can reject the State Department's claim preclusion arguments on this basis alone.

### B. **The prior case did not render a final judgment on the merits.**

Second, the State Department cannot conclusively establish the third element of its affirmative defense, which requires a "prior judgment [that] was *final* and *on the merits*."  *Ayissi v. Kroger Tex., L.P.*, 849 Fed. App'x 489, 490 (5th Cir. 2021) (emphasis added).  Indeed, claim

preclusion's need for a *final* judgment *on the merits* is black-letter law. *See* Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 4406 (West 2021). All courts require a judgment that is *final* as opposed to interlocutory, *see, e.g.*, *Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1272–73 (5th Cir. 1986); *Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 230 (5th Cir. 2018); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 395–96 (5th Cir. 1998); and all courts require that the judgment be on the merits and not some other ground, *see, e.g.*, *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 676 (5th Cir. 2003); *Miller v. Nationwide Life Ins. Co.*, No. 06-31178, 2008 WL 3086783, at *5 (5th Cir. Aug. 6, 2008); *Foster v. City of El Paso*, 308 Fed. Appx. 811, 812 (5th Cir. 2009).

Here, however, there is no final judgment whatsoever and certainly none on the merits. The complaint in *Defense Distributed I* was dismissed without any adjudication. It produced no judgment at all, let alone one on the merits. The Fifth Circuit expressly held this—that *Defense Distributed I* produced no judgment at all—in a decision the State Department itself procured:

> [T]here is no "judgment" when the parties voluntarily dismiss the entire case under Rule 41(a)(1)(A)(ii). Under Rule 41(a)(1)(A), a stipulation of dismissal operates to dismiss the action "without a court order." Fed. R. Civ. P. 41(a)(1)(A). And "[a] stipulation of dismissal under that rule ordinarily—and automatically—strips the district court of subject-matter jurisdiction" over the dismissed action. So the district court here had no jurisdiction to enter final judgment in this case.

*Def. Distributed v. United States Dep't of State*, 947 F.3d 870, 873 (5th Cir. 2020) (quoting *Nat'l City Golf Fin. v. Scott*, 899 F.3d 412, 415–16 (5th Cir. 2018)) (paragraph break omitted).

The fact that the dismissal was "with prejudice" is irrelevant. The Fifth Circuit has rejected the argument that the inclusion of "with prejudice" language in a stipulated dismissal "categorically triggers a res judicata bar":

> Nationwide argues that regardless of the grounds upon which Miller's prior claim was dismissed, the dismissal of Miller's suit "with prejudice" suffices to trigger a res judicata bar to the claim. Essentially, Nationwide urges that we hold that any "with prejudice" comment associated with a dismissal categorically triggers a res

judicata bar. However, our precedent does not demonstrate such an unwavering categorical approach, and we decline to adopt one here.

*Miller v. Nationwide Life Ins. Co.*, No. 06-31178, 2008 WL 3086783, at *5 (5th Cir. Aug. 6, 2008).

Here, because the parties stipulated to a dismissal *before* the Court ever entered a final judgment, the Court "had no jurisdiction to enter final judgment in this case." *Def. Distributed v. United States Dep't of State*, 947 F.3d at 873.  As such, the "with prejudice" language in the Settlement Agreement and the Plaintiffs' notice of dismissal cannot make up for the State Department's failure to establish a "prior judgment [that] was *final* and *on the merits*." *Ayissi*, 849 Fed. App'x at 490.

### C.    The requisite claim identity is missing.

Finally, the State Department has not proven that "the plaintiff[s] raise[d] the same cause of action in both suits." *Id.*  In determining whether a defendant has satisfied this element, courts apply "a 'transactional test,' focusing on whether the cases are based on the same nucleus of operative facts." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 899 (5th Cir. 2016) (Jones, J.).  This, in turn, requires them to "consider whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id*. Importantly, the Fifth Circuit has "held that 'subsequent wrongs' by a defendant" that occur after settlement of one lawsuit "constitute new causes of action" that support a second. *Id.* (quoting *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 314 (5th Cir. 2004)).

Two cases illustrate the logic behind this principle.  In *Oreck Direct, LLC v. Dyson, Inc.*, 560 F.3d 398 (5th Cir. 2009), a vacuum cleaner manufacturer sued its competitor under the Lanham Act, alleging that the competitor's representations that its "DC18" model vacuum cleaner exhibited "no loss of suction" and was the "most powerful lightweight" model on the market. *Id.*

13

at 400.   In a prior lawsuit, however, the manufacturer had alleged that the competitor "falsely advertised that its vacuum cleaners do not lose suction" without limiting "its claims to representations about specific . . . vacuum cleaner models or to specific modes of advertising or promotion." *Id.*  The parties settled the first lawsuit and filed a joint motion to dismiss, which the district court granted.  *Id.*  The Fifth Circuit affirmed summary judgment in the second lawsuit against the manufacturer.  *Id.* at 402–03.  The Court reasoned that the competitor "was advertising the DC18 to retailers during the pendency of [the first lawsuit] and using the . . . representations [the manufacturer] then alleged to be false."  *Id.* at 403.  In fact, the competitor "produced information concerning the DC18 (then labeled as the "N70") during discovery."  *Id.*  "Because [the competitor's] claims concerning the DC18 could have been advanced in support of the causes of action [in the first lawsuit]," the court concluded the claims in the second lawsuit were the same, satisfying the final element of claim preclusion.  *Id.*

In *Retractable Technologies*, by contrast, the court held that res judicata did not preclude a second lawsuit because "[t]he advertisements [the plaintiff] complain[ed] of in its second lawsuit were made after the 2004 settlement of the first lawsuit."  842 F.3d at 899.  As such, the plaintiff "could not have brought these claims during the pendency of the first lawsuit, and the new post-2004 advertisements and sales tactics of [the defendant] created new causes of action that [were] not barred by res judicata."  *Id.*  As these cases demonstrate, the purpose of the "same cause of action" element is to ensure that the plaintiff brings all the claims it could have brought in the first lawsuit in that lawsuit.

This case is indistinguishable from *Retractable Technologies*.  Most obviously, this case involves the State Department's censorship of files that Defense Distributed did not attempt to publish until *after* its settlement with the State Department.  *Compare* Dkt. 117 ¶ 53 (describing

14

files at issue in *Defense Distributed I*, which were published from December 2012 to March 2013); *id.* ¶ 89 (settlement executed on June 29, 2018), *and id.* ¶ 55 (noting publication of *Defense Distributed I* files following settlement) *with id.* ¶¶ 58–67 (describing entirely *new* files published under restrictions designed to ensure compliance with State Department regulations from August 2018 to November 2018 and from March 2020 to the present) *and id.* ¶ 69 (indicating that the files Defense Distributed published across these periods differed).   Thus, like in *Retractable Technologies*, Plaintiffs "could not have brought the[] claims" based on these new publications "during the pendency of the first lawsuit, and the new [censorship by the State Department] created new causes of action that are not barred by res judicata."  842 F.3d at 899.

In addition, Plaintiffs' remaining claims do not simply recycle their causes of action from *Defense Distributed I*.  Rather, they are based on actions the State Department took *after Defense Distributed I* settled, including its

- disavowal of the license it had issued to Plaintiffs in July 2018;

- refusal to issue the letter advising Plaintiffs that the *Defense Distributed I* Published Files, Ghost Gunner Files, and CAD Files were approved for public release;

- refusal to modify the USML regulations to exclude the technical data that was the subject of *Defense Distributed I*; and

- disavowal of the temporary modification it had issued to exclude that data from USML regulations and ensure that all U.S. persons could access, discuss, use, reproduce, or otherwise benefit from that data.

Dkt. 117 ¶¶ 110-31; *see also, e.g.*, *id.* ¶¶ 185-91, 193-99, 201-207, 209-215 (APA claims based on this post-Settlement conduct); *id.* ¶¶ 231-36 (same for First Amendment claims); *id.* ¶¶ 240-45 (same for Second Amendment claims); *id.* ¶¶ 249-53 (same for Due Process claims).

Again, because the State Department had not taken any of these actions while *Defense Distributed I* was pending, Plaintiffs "could not have brought [them] during the pendency of the first lawsuit." *Retractable Tech.*, 842 F.3d at 899. Accordingly, the State Department's post-Settlement actions "created new causes of action that are not barred by res judicata." *Id.*

The State Department attempts to circumvent this rule by citing a non-binding Eighth Circuit case for the proposition that "positing a few additional facts that occurred after the initial suit" cannot overcome a *res judicata* defense. Mot. at 16 (quoting *Misischia v. St. John's Mercy Health Sys.*, 457 F.3d 800, 805 (8th Cir. 2006)). But this rule flies in the face of *Retractable Technologies*, a binding Fifth Circuit case that obviously controls over *Misischia*. In any case, the plaintiff in *Misischia* was not asserting new "independent RICO claims"—he was attempting to use "alleged predicate acts occurring after the state court judgment . . . to revive RICO claims" that he had filed in state court. 457 F.3d at 805; *see also id.* at 803-04. This is very different from the situation here, where all Plaintiffs' claims are independently based on courses of conduct that occurred after the settlement.

## III.    The Settlement Agreement did not release later-arising claims about trampling the Settlement Agreement, Constitution, and APA.

The motion argues that "Plaintiffs' non-contract claims are . . . subject to dismissal because they are barred by  . . . the broad release contained in the Settlement Agreement." Dkt. 162 at 1, 17-18. The Court should reject this for two reasons.

First, like *res judicata*, any argument that a plaintiff has released claims against a defendant is an affirmative defense, which makes it procedurally improper on a motion to dismiss. *See Deckard v. Gen. Motors Corp.*, 307 F.3d 556, 560 (7th Cir. 2002) ("A motion to dismiss was improper since release is an affirmative defense, Fed. R. Civ. P. 8(c), and the existence of a defense does not undercut the adequacy of the claim."). This is particularly important in the release context

because, as the State Department acknowledges, the validity of a release turns on a number of different factors that require factual development during the course of discovery. *See Clayton v. ConocoPhillips Co.*, 722 F.3d 279, 292 (5th Cir. 2013). Specifically, a plaintiff can overcome a release defense by showing, as a factual matter, that it never "received adequate consideration" or that the "the release was invalid because of fraud, duress, material mistake, or some other defense." *Id.* Release is also subject to estoppel, which the State Department's flip-flopping in action after action has triggered. All of these issues require evidence, which requires discovery. The State Department's attempt to obtain a Rule 12(b) dismissal based on its release defense, therefore, is just as procedurally improper as its *re judicata* argument.

Second, the release argument is wrong because the Settlement Agreement's release provision clearly does *not* cover the claims at issue. The Settlement Agreement's release provision applies only to preexisting claims—those that "were or could have been raised" *in that case*. Dkt. 155 at 23. But as explained above, all of the claims at issue here are *new*. They were not released *by* the Settlement Agreement because they *arise from* the Settlement Agreement and actions the State Department took following that agreement. Absent express language to the contrary (the Settlement Agreement has none), a contract that predates claims does not release them. *See, e.g.*, *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 98 (5th Cir. 1974) ("[A]s a matter of law, the general release in the case sub judice is ineffective to bar claims arising subsequent to . . . the date of its execution."); *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 504 (2d Cir. 2014) ("A settlement, just like a judgment, does not ordinarily bar claims that have not yet accrued. . . . [unless the parties] agree to extinguish future claims.").

**IV.     Nothing belongs at the Court of Federal Claims.**

The motion invokes the Tucker Act's rule of exclusive jurisdiction in the Court of Federal Claims to a very limited extent.  There is no Tucker Act argument to be made about any of the Plaintiffs' claims for prospective or declaratory relief, since well-established precedent shows why the Tucker Act does not reach them.  *See, e.g.*, *Columbus Reg'l Hosp. v. Fed. Emergency Mgmt. Agency,* 708 F.3d 893, 897 (7th Cir. 2013); *Normandy Apartments, Ltd. v. U.S. Dept. of Hous. & Urban Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009).[12]  The motion just says that, because of the Tucker Act, the Court of Federal Claims has exclusive jurisdiction over (1) the breach-of-contract action's claim for retrospective damages, and (2) the non-contract actions' claims for retrospective damages.  Dkt. 162 at 2.  The Court should reject this for several distinct reasons.

**A.     The Tucker Act does not apply.**

Whether or not the Tucker Act applies depends, in part, on whether the action is a creature of federal law as opposed to state law.  Apart from the rules for *federal* contract actions, the Tucker Act does *not* apply and does *not* divest federal district courts of jurisdiction where, as here, the breach-of-contract action sounds in *state law* and meets the traditional test for supplemental

---

[12] Though the motion is best read as challenging only the contract action's claims for retrospective damages, any argument State Department might make about the Tucker Act barring a contract action for prospective relief is squarely defeated by The State Department's Tucker Act and APA arguments are squarely defeated by *Normandy Apartments*, 554 F.3d at 1300.  Where, as here, "a party asserts that the government's breach of contract is contrary to federal regulations, statutes, or the Constitution, and when the party seeks relief other than money damages, the APA's waiver of sovereign immunity applies and the Tucker Act does not preclude a federal district court from taking jurisdiction."  *Id.* at 1300; *see also Columbus Reg'l Hosp.*, 708 F.3d at 897 ("To the extent that [a] constitutional theory demands money as a remedy, it belongs in the Court of Federal Claims. To the extent that it seeks prospective relief, such as another hearing, it is within the scope of § 702.").  Regardless of whether claims for money damages might belong elsewhere, *Normandy Apartments* makes clear that Defense Distributed and SAF's contract, APA, and Due Process claims for non-damages relief (such as the instant injunction) are fully within this Court's jurisdiction.

jurisdiction.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *Pershing Div. of Donaldson, Lufkin & Jenrette Sec. Corp. v. United States*, 22 F.3d 741, 743 (7th Cir. 1994) ("The government counters that . . . *Gibbs* set the standard for determining when a federal court has pendent (now supplemental) jurisdiction over related state law claims . . . .").

What law governs this contract action is not yet known.  The complaint pleads the action without specifying choice of law, Dkt. 177 ¶¶ 216-224, and it is improper for a Rule 12 jurisdictional analysis to jump ahead and make that fact-laden decision, *see McManaway v. KBR, Inc.*, No. 12-20763, 2013 WL 8359992, at *1 (5th Cir. Nov. 7, 2013).  So under one very plausible version of the facts, Texas law applies and the Tucker Act does not.  The Court should hold that the Tucker Act poses no jurisdictional problem for the Plaintiffs' breach-of-contract claim for retrospective damages, and this aspect of the motion should be denied.[13]

### B.    The State Department waived and/or is estopped from asserting the Tucker Act and sovereign immunity.

To the extent that sovereign immunity might generally bar the damages claims at issue, it does not apply here because the State Department "waived any and all grounds of opposition to court enforcement of the Settlement Agreement," including sovereign immunity.  Dkt. 177 ¶ 224.  It did so in Settlement Agreement paragraph 4, which shows the State Department's consent to "any civil, criminal, or administrative action . . . permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement."  *Id.*  The State Department's denial of this

---

[13] Alternatively—if and only if the Court decides that the Tucker Act divests the Court of jurisdiction over the case's retrospective damages claims—Plaintiffs request leave to amending the complaint's damage request to fall under the Little Tucker Act's $10,000 threshold.  *See Ware v. United States*, 626 F.2d 1278, 1287 (5th Cir. 1980) ("Federal district courts are granted concurrent jurisdiction with the Court of Claims only over suits for $10,000 or less.").

construction, Dkt. 162 at 20, is not a *matter of law* answer; it is a matter-of-fact defense about contract construction to be litigated on summary judgment after discovery.

Similarly, the State Department cannot assert sovereign immunity because it is estopped from doing so by its conduct of the *Washington I* litigation.   If correct, the State Department's current jurisdictional argument would establish that jurisdiction was lacking in *Washington I* because that case implicated the Settlement Agreement just as much as this one.  *See Washington v. United States Dep't of State*, No. C18-1115RSL, 2018 WL 5921011, at *2 (W.D. Wash. Nov. 13, 2018) ("the Court's findings will bind all of the interested parties and preclude collateral challenges to the APA determination (such as an action for specific performance of the settlement agreement)").   Yet the State Department had the district court there exercise jurisdiction, *Washington v. United States Dep't of State*, 420 F. Supp. 3d 1130, 1141 (W.D. Wash. 2019), and now is trying to use the decision to its advantage (by, among other things, embracing the judgment vacating Plaintiffs' license).  The Tucker Act and sovereign immunity cannot be had both ways, and the State Department made its choice.  Unless and until the State Department concedes that the Tucker Act and/or sovereign immunity deprived *Washington I* of jurisdiction, it cannot succeed on the same theory here.  *See New Hampshire v. Maine*, 532 U.S. 742, 742–43 (2001).

Even if these arguments are not completely decisive now, they turn on questions of fact that require evidentiary development.  Dismissal before any factual inquiry regarding the extent of the State Department's waiver and estoppel would be premature.  *See infra* Parts II.A & III.

**CONCLUSION**

The motion should be denied.

July 12, 2021

Respectfully submitted,

BECK REDDEN LLP
By /s/ Chad Flores
Chad Flores
cflores@beckredden.com
Texas Bar No. 24059759
Daniel Nightingale
dhammond@beckredden.com
Texas Bar No. 24098886
Hannah Roblyer
hroblyer@beckredden.com
Texas Bar No. 24106356
1221 McKinney Street, Suite 4500
Houston, TX 77010
(713) 951-3700 | (713) 952-3720 (fax)

CLARK HILL PLC
Matthew A Goldstein
mgoldstein@clarkhill.com
D.C. Bar No. 975000
1001 Pennsylvania Avenue Northwest
Suite 1300 South
Washington, DC 20004
(202) 550-0040 | 202-552-2371 (fax)

Josh Blackman
joshblackman@gmail.com
Texas Bar No. 24118169
1303 San Jacinto Street
Houston, TX 77002
(202) 294-9003 | (713) 646-1766 (fax)

Attorneys for Plaintiffs Defense Distributed
and Second Amendment Foundation, Inc.

## CERTIFICATE OF SERVICE

I certify that a copy of this filing was served on all parties and/or their counsel of record through a manner authorized by Federal Rule of Civil Procedure 5(b) on July 12, 2021.

/s/ Chad Flores
Chad Flores